476 So.2d 1319 (1985)
Mabel A. FINCKE, R.N., Chicago Insurance Company, a Foreign Corporation, the Good Samaritan Hospital Association, Inc., a Florida Corporation, and the Florida Medical Malpractice Joint Underwriting Association, Appellants,
v.
Shirley PEEPLES, As Personal Representative of the Estate of Thomas Peeples, Jr., Deceased, Pierce Weinstein, M.D., Etc., et al., Appellees.
Pierce WEINSTEIN, M.D., Weinstein, Hooper, Johnsen, Szmukler & Carrillo, P.A., and Florida Physicians' Insurance Reciprocal, Appellants,
v.
Shirley PEEPLES, As Personal Representative of the Estate of Thomas Peeples, Jr., Deceased, Appellee.
GOOD SAMARITAN HOSPITAL, the St. Paul Insurance Company, Mabel Fincke, and Chicago Interstate Insurance Company, Appellants,
v.
Shirley PEEPLES, As Personal Representative of the Estate of Thomas Peeples, Jr., Deceased, Pierce Weinstein, M.D., Etc., et al., Appellees.
Nos. 84-562, 84-590, 84-691, 84-1063, 84-792 and 84-1083.
District Court of Appeal of Florida, Fourth District.
September 18, 1985.
Rehearing and Stay Denied November 7, 1985.
*1320 Larry Klein of Klein & Beranek, P.A., West Palm Beach, for Pierce Weinstein, M.D., Weinstein, Hooper, Johnsen, Szmukler & Carrillo, P.A., and Florida Physicians' Ins. Reciprocal.
Edna L. Caruso of Edna L. Caruso, P.A., and Montgomery, Lytal, Reiter, Denney & Searcy, P.A., West Palm Beach, for Shirley Peeples, etc.
Steven R. Berger of Steven R. Berger, P.A., and Bernard & O'Brien, Miami, for Good Samaritan Hosp., The St. Paul Ins. Co., Mabel A. Fincke, R.N., and Chicago Interstate Ins. Co.
HERSEY, Chief Judge.
Appellant health care providers and their insurers appeal a malpractice award of $1,018,019.10 and an award of costs and attorneys' fees of $335,857.35. We affirm.
On November 16, 1981, Bruce Fishbane, M.D., an orthopedic surgeon, performed surgery on the right knee of seventeen-year-old Thomas Peeples to repair a torn medial meniscus. Pierce Weinstein, M.D., was the anesthesiologist. The operation took approximately two hours, without complication, after which Peeples was taken to the recovery room by Fishbane and Weinstein. Fishbane said that when they arrived, Weinstein placed his hand over the endotracheal tube to determine the depth of Peeples' respiration, and was about to extubate Peeples when Fishbane left the room. At that time, Peeples was not awake, moving, or bucking or fighting the tube. Fishbane left, spoke with Peeples' family in the waiting area, and returned to the recovery room a few minutes later to find that Peeples had been extubated. He made notes on the operation for ten or fifteen minutes, during which time Weinstein was not in the room but Mabel Fincke, R.N., was. Fincke told Fishbane that Peeples was sleeping and everything was fine, so he left. Fishbane was on the fourth floor with another patient when he heard over the PA system that there was a cardiac arrest in the recovery room. When he arrived three to five minutes later, Peeples had been reintubated by an anesthetist nurse, and his heart rate was normal but his pupils were nonreactive. Fincke told *1321 Fishbane that another patient had been wheeled into the recovery room and she had been taking care of him for several minutes when she realized that Peeples' heart had stopped. Peeples never regained consciousness and died on November 29, 1981.
Weinstein said that his notes indicated that Peeples, while in the recovery room, "Bucked and coughed on tube ... Turned head  pulled out because patient could not tolerate tube." This was written at approximately 11:30 that morning. Weinstein later wrote, "patient admitted to recovery room at 10:50. At that time patient was reacting to endotracheal tube, bucking and coughing against tube." He said that if a patient does not so react, then he is still unconscious and unable to breathe on his own and the tube should not be removed. If the tube is removed and the patient falls back into the anesthesia, he might stop breathing. To prevent that, the recovery room nurse should constantly monitor the patient. When Weinstein left the recovery room after removing the tube, Peeples' airway was open and his oxygen supply was adequate.
Nurse Fincke testified that Weinstein removed the tube as soon as he wheeled Peeples into the recovery room. At that time Peeples was not moving any limbs, had shallow breathing and had no consciousness whatsoever. Fincke put an oral airway into Peeples' mouth after the tube was removed, "and if he showed any degree of consciousness, he would have resisted the oral airway being placed in his mouth."
The trial court denied appellants' motion in limine to exclude testimony concerning previous complaints of Weinstein's premature extubation. The following testimony was introduced on that issue:
Nurse Fincke testified:
Q But you knew the patient had been extubated prematurely, didn't you?
A Yes, sir.
Q Does that happen often? Did that happen often with Dr. Weinstein? Was that a problem so to speak, in the recovery room? Go ahead and answer the question. Don't be nervous about it.
A Yes.
Q Had there been any complaints made to the administration in regard to Dr. Weinstein by you or any members of the recovery room staff?
A Yes.
Q To whom did you make your complaints?
A To Dr. Carrillo, the head of the anesthesiology.
Q On what occasions or how often did these complaints occur prior to the death of the young Peeples boy?
A I don't know, sir.
... .
Q But it was with some degree of regularity; right?
A Yes, sir.
Q What would Dr. Carrillo say to you when this occurred; in other words, when you made these complaints to him?
A He already had been told on previous occasions about it, and he said he would talk to Dr. Weinstein.
Nurse Kepke testified:
Q And over coffee, did you and Mrs. Fincke and the other nurses talk about Dr. Weinstein and historically what he would do so far as extubating patients are concerned?
... .
A It was mentioned, yes.
Q Tell us what was mentioned. Don't be nervous about it.
A We felt that patients were extubated too soon at times.
... .
Q All right. Did you discuss this problem with Dr. Weinstein with Mrs. Ford before this incident occurred?
A I believe we did. I'm 
Q Yes, ma'am. Do you have a belief of whether or not these complaints were reported to anesthesia, the Anesthesia Department?

*1322 A In a case like that, if we had a complaint, Mrs. Ford would go to anesthesia with it.
Q Nothing was ever done about it, was it, Mrs. Kepke?
A Not that I know.
Nurse Barnes testified:
Q Do you have any recollection of any complaints in regard to Dr. Weinstein and the recovery room practices that you experienced or that were experienced by the nurses there?
A Other than conversations between us and our head nurses?
Q What was that conversation, please, ma'am?
A Just, to the best of my knowledge, a general discussion.
Q About what?
A Our feelings.
Q About what?
A The condition of patients arriving in the recovery room.
Q Meaning what?
A We felt that sometimes they arrived there and they were not breathing satisfactorily.
Q And what would Dr. Weinstein do, even historically, that you all discussed? What would Dr. Weinstein do even in the face of that?
A (No response.)
Q He'd leave, wouldn't he?
A Yes.
Q And that's what you all discussed, right?
A Yes.
Q And you discussed it with your head nurse, didn't you?
A Yes.
Q Were these comments made at staff meetings?
A Yes.
Appellees argue that appellants waived their right to appeal the admission of this testimony because they failed to timely object at trial.
Appellants' motion in limine to exclude the evidence was argued at trial before the jury was selected. After the jury was selected, the trial court denied the motion in limine. After opening statements and the short deposition of Kenneth Weda, the deposition of Mabel Fincke was read, which contained the testimony sought to be excluded. At the end of Fincke's deposition, appellants renewed their objection to the testimony in question and said that they assumed that their objections to the testimony of the other nurses (Kepke and Barnes) would be preserved without their having to stand up at the time. The court held that their objections were timely.
The general rule is that a motion in limine is not sufficient to preserve the error for appellate review in the absence of further contemporaneous objection when the testimony is offered. For instance, in Parry v. Nationwide Mutual Fire Insurance Company, 407 So.2d 936 (Fla. 5th DCA 1981), the court explained:
The fact that appellant made a motion in limine and a general objection before the testimony is not sufficient to preserve the error for review. The specific question must be objected to when asked at trial or the error is waived.
Id. at 937 (citation omitted).
In Swan v. Florida Farm Bureau Insurance Company, 404 So.2d 802 (Fla. 5th DCA 1981), appellant filed a motion in limine prior to trial to exclude certain evidence, and the motion was denied. At trial appellee introduced the evidence without objection. Appellant argued on appeal that the motion in limine, overruled by the trial court, eliminated the need to object at trial. The court disagreed and required "a contemporaneous objection to the introduction of evidence at trial in order to preserve the issue for appellate review... ." Id. at 803. The court went on to say that the purpose of the contemporaneous objection is to put the trial judge on notice that error may have been committed and to give him an opportunity to correct it at an early stage of the proceedings.
The judge deserves the opportunity to rule on the evidence in the light of what is happening, the evidence previously admitted *1323 and the specific grounds for the objection. Having previously overruled the motion in limine, he might now sustain the objection if it is made, but he cannot be left to guess that a generally phrased pre-trial objection is still valid in the shifting pattern of the actual trial.
Id. at 804.
In Holmes v. Mernah, 427 So.2d 378 (Fla. 4th DCA 1983), appellant sought to have testimony excluded by way of an oral motion in limine "made very early in the trial while the jury was excused and before either party testified upon the issue of privilege." Id. at 379. This court held that the absence of a subsequent objection was not fatal. "Because the trial judge was given the opportunity to prevent the error by the motion in limine, we perceive no logical reason not to consider it as sufficient in this case." Id.
Clearly in the instant case the trial court was aware of the real and continuing nature of the objection, recognizing it as "timely." We therefore hold that the alleged error was sufficiently preserved for appellate review.
The possibility of error thus having been preserved, appellants argue that testimony as to Dr. Weinstein's alleged proclivity to prematurely extubate patients was erroneously admitted and prejudicially so.
It cannot be doubted that the testimony of a history of careless, indeed callous, conduct would be likely to affect the jury and enlarge the award of damages. However, the testimony was probative. The question is whether it was relevant and material. Appellees obviously take the position that the testimony was admissible. They offer three alternative theories as to admissibility. We reject two of those theories.
First, we disagree that evidence of prior circumstances was admissible to show Nurse Fincke's negligence. See Carter v. Rukab, 437 So.2d 761 (Fla. 1st DCA 1983). We also cannot accept appellees' theory that the evidence was admissible to show that Dr. Weinstein had a habit of prematurely extubating patients. The testimony consisted of nurses' opinions on that question, not facts. We therefore contrast this situation to Locke v. Brown, 194 So.2d 45 (Fla. 2d DCA 1967), involving the fact that plaintiff was an habitual drunkard, relying rather on the general rule that evidence of prior occurrences is not admissible. See, e.g., Short v. Allen, 254 So.2d 34 (Fla. 3d DCA 1971); Zayres Department Stores v. Fingerhut, 383 So.2d 262 (Fla. 3d DCA 1980).
Appellees' third argument is that the evidence was admissible to support their punitive damages claim against the hospital in that the testimony showed that the hospital was aware of the complaints about Weinstein but did nothing about them. Since the punitive damages claim was in issue at trial, evidence which proves the allegation would be admissible. See Carter v. Rukab, 437 So.2d at 762 ("any fact relevant to prove a fact at issue is admissible into evidence unless its admissibility is precluded by some specific rule of exclusion"); § 90.402, Fla. Stat. (1983).
In Piper Aircraft Corporation v. Coulter, 426 So.2d 1108 (Fla. 4th DCA), rev. denied, 436 So.2d 100 (Fla. 1983), the record revealed that appellant's test pilot knew of accidental door openings on its airplanes, and that he advised his superiors of the danger and the need to modify the aircraft. However, appellant took no action to remedy the defect, ordered the pilot to destroy any records of the problem, and took no steps to advise purchasers of the defect. This court concluded: "This failure to act in the face of a known, substantial danger to the lives of the aircraft occupants could constitute a sufficient basis for an award of punitive damages." 426 So.2d at 1110 (citation omitted).
The Coulter case indicates that the evidence in this case, which shows the hospital's knowledge of the nurses' complaints about Dr. Weinstein, would be admissible as relevant to appellees' punitive damages claim and appellees' failure during trial to pursue that claim and submit it to the jury *1324 does not render the evidence inadmissible. See Sims v. State, 59 Fla. 38, 52 So. 198, 200 (1910) ("The admissibility of testimony does not depend upon its sufficiency to prove the issue"); Bass v. O'Berry, 59 Fla. 159, 51 So. 597 (1910) ("The sufficiency or insufficiency of the evidence to prove the issue does not affect its admissibility"); State v. Fischer, 387 So.2d 473, 475 (Fla. 5th DCA 1980) ("The admissibility of testimony does not depend upon its sufficiency, standing alone, to prove the issue").
We conclude that the evidence was admissible to show that the hospital was aware of the complaints about Weinstein and took no action to remedy the situation, since this relates to the propriety of awarding punitive damages against the hospital.
Appellant argues that, because such testimony might be admissible on the very theory we have applied, the punitive damages claim should not have been tried with the remainder of the lawsuit. In his motion in limine and at the hearing on the motion Weinstein requested that the trial court sever the punitive damages portion of the claim against the hospital, because evidence of prior complaints to the hospital would be extremely prejudicial and irrelevant to Weinstein's case. We hold that even if the trial court committed error in not severing the punitive damages claim, such error was harmless because the evidence in question was not so prejudicial to Weinstein and Fincke as to constitute reversible error.
In Palmes v. State, 397 So.2d 648, 653-54 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981), the Florida Supreme Court held:
In determining whether an erroneous ruling below caused harm to the substantial rights of the defendant, an appellate court considers all the relevant circumstances, including any curative ruling or event and the general weight and quality of the evidence. In other words, the court inquires generally whether, but for the erroneous ruling, it is likely that the result below would have been different.
See also Jones v. State, 453 So.2d 1192, 1194 (Fla. 3d DCA 1984) ("the correct standard for appellate review is whether `the error committed was so prejudicial as to vitiate the entire trial [,]'" (emphasis original)). If the evidence was merely cumulative and there was ample, competent evidence to prove the issue, then the error was harmless and would not call for reversal. Jefferson Disposal Co. v. Green, 311 So.2d 785 (Fla. 3d DCA 1975).
In this case several experts testified. Dr. Fishbane testified that, although he was not an expert in the area of anesthesia, he saw no problem in Weinstein's management of this patient. Rather, the responsibility for preventing Peeples' hypoxic condition was that of Nurse Fincke.
Dr. Weinberger, an expert in anesthesiology, testified that Weinstein "deviated from good medical care during the period of time when he brought the patient into the recovery room," in that he removed the tube prematurely and abruptly left without waiting to see if Peeples was breathing adequately. He went on to say that "Nurse Fincke definitely did not carry on the best practice of recovery room nurses in that she, from her own testimony and also from what she wrote on the chart, recognized that Mr. Peeples was not breathing adequately."
Dr. Collins, an expert in anesthesiology, testified that both Weinstein and Fincke deviated from the standard of care by not attaching Peeples to an EKG monitor in the recovery room; that Weinstein was negligent in extubating Peeples and promptly leaving without discussing his condition and care with Fincke; and that Fincke was negligent in not insisting that Weinstein or another anesthesiologist come back to the recovery room.
Dr. Cullen, an expert in anesthesiology, said that Nurse Fincke met the standards of care in this case and that although extubating Peeples when Weinstein did was not negligent, it was negligent for him to leave so soon and without exchanging information with Nurse Fincke.
*1325 Dr. Lichtiger, an expert in anesthesiology, testified that Weinstein did not deviate from the standards of care because Peeples' vital signs at 10:50 were adequate. Therefore, his airway became obstructed sometime after that, when it was the responsibility of Nurse Fincke to prevent such an occurrence.
Helen Noel, the critical care instructor at West Haven Veterans Administration Medical Center, testified that Nurse Fincke was negligent in allowing Peeples to remain in shallow breathing following anesthesia. She should have stimulated Peeples to breathe, called for intervention, or had him reintubated, especially since Fincke felt that extubation had been premature.
In light of this expert testimony and the additional testimony and evidence, we conclude that the result would not have been different had the testimony been excluded from the trial; thus, denial of severance was harmless error.
We affirm the damages award and as well the award of costs and attorneys' fees.
AFFIRMED.
DELL, J., concurs.
ANSTEAD, J., concurs in part and dissents in part with opinion.
ANSTEAD, Judge, concurring in part and dissenting in part:
I dissent from that portion of the majority opinion holding that the admission of the nurses' testimony was harmless as to the claim against Dr. Weinstein.