905 So.2d 182 (2005)
FITTIPALDI USA, INC., Appellant,
v.
Helio CASTRONEVES, Appellee.
No. 3D04-569.
District Court of Appeal of Florida, Third District.
March 30, 2005.
Rehearing and Rehearing Denied July 13, 2005.
*183 Steel Hector & Davis, Alvin B. Davis and Digna B. French, Miami, for appellant.
Lauri Waldman Ross, Miami, for appellee.
Before COPE, FLETCHER, and CORTIÑAS, JJ.
Rehearing and Rehearing En Banc Denied July 13, 2005.
CORTIÑAS, Judge.
The plaintiff, Fittipaldi USA, Inc. ("FUSA"), appeals from an adverse final judgment after a jury trial. We affirm.
On June 11, 1997, Helio Castroneves, a race car driver, and FUSA, through its principal, Emerson Fittipaldi, entered into a five-year Management Agreement wherein FUSA agreed to serve as Castroneves' exclusive manager and representative. The Management Agreement provided, among other things, that FUSA would procure (1) professional motorsport driving opportunities, (2) merchandising, licensing, and endorsement agreements, and (3) corporate sponsorship for Castroneves. In exchange, Castroneves agreed to compensate FUSA with varying percentages of his gross revenues. The Management Agreement provided that either party could terminate the agreement for reasonable cause. Reasonable cause for Castroneves to terminate the Management Agreement was further defined, in relevant part, as breach of any term and condition and/or the failure of FUSA to use its best efforts to attempt to procure the necessary agreements for merchandising, licensing, endorsements, and corporate sponsorships.
On January 26, 1999, FUSA obtained an employment agreement for Castroneves with Hogan Racing, L.L.C. ("Hogan"). For the 1999 racing season, Hogan agreed to pay Castroneves a $250,000 salary, plus incentives, and $50,000 in travel expenses.
Simultaneously with the execution of the Hogan Agreement, FUSA and Fittipaldi entered into a Marketing Agreement with Hogan wherein, for the year 1999, Fittipaldi personally guaranteed to fund or raise through corporate sponsorships a minimum of $1 million by March 15, 1999, and committed to raising a minimum of $3 million in corporate sponsorships for Hogan Racing. In return, FUSA would receive a 15% commission on any sponsorship funds FUSA raised above $3 million. Under the terms of the Hogan Agreement, Hogan was not required to pay Castroneves if it did not receive the required sponsorship funds from FUSA or Fittipaldi.
*184 On February 12, 1999, Hogan, Castroneves, and Ilmor Engineering, Inc. ("Ilmor") executed an Assignment of the Hogan Agreement stating that, if Hogan was unable to obtain sufficient funding for the 2000 season by September 1, 1999, Hogan could immediately transfer to Ilmor all of its rights to Castroneves' services. If Ilmor was unable to find a driving position for Castroneves by October 15, 1999, then Castroneves would be free to accept any other offer.
In February and March 1999, Fittipaldi failed to raise the required sponsorship funds, and, as a result, Hogan withheld payment of Castroneves' salary and expenses. On May 3, 1999, Hogan wrote to Fittipaldi demanding the $1 million guarantee. Hogan explained that, because of Fittipaldi's failure to fulfill his obligation, Castroneves had not received any salary payment. On October 5, 1999, Hogan notified Fittipaldi of its intent to file suit.
On October 26, 1999, at a race in Fontana, California, Hogan publicly announced that its team was ceasing operations. Although Ilmor contemplated organizing a race team, it did not have sufficient funds in place to do so. On October 28, 1999, Castroneves met with the Walker Racing Team's attorney, Alan Miller, and they discussed a possible buy-out of the Ilmor contract, but no agreement was reached. On October 30, 1999, at the Fontana race, another driver was fatally injured, and Castroneves was approached by that driver's team, Penske Racing Team, Inc. ("Penske"). During this time, Fittpaldi was not present to assist Castroneves.
On November 1 or 2, 1999, Castroneves asked Alan Miller to represent him. On November 3, 1999, Castroneves served FUSA with a notice of termination of the Management Agreement citing the following reasons for termination: 1) failure to pay $1 million to Hogan, 2) failure to assist Castroneves during the Fontana race weekend, 3) breach of contract and breach of fiduciary duty for the foregoing activities, 4) failure to comply with duties as described in the Management Agreement, and 5) failure to use best efforts to develop merchandising and licensing endorsements or corporate sponsorships.
On November 3, 1999, Castroneves advised Ilmor that its agreement was void since the date for providing an alternative driving position had passed.
On November 5, 1999, Castroneves, represented by Miller, executed a driver's contract and a relationship agreement with Penske.
On February 29, 2000, FUSA filed a complaint against Castroneves alleging breach of contract. On April 7, 2000, Castroneves filed his answer, affirmative defenses, and counterclaims seeking declaratory relief and alleging breach of contract, breach of fiduciary duty, fraudulent inducement, tortious interference with a prospective business relationship, and fraud. Castroneves also filed a three-count third-party complaint against Fittipaldi. On May 12, 2000, FUSA and Fittipaldi served their answers and affirmative defenses to the counterclaims and the third-party complaint.
A jury trial was conducted from February 2-7, 2004. Neither FUSA nor Castroneves prevailed at trial as the jury returned a verdict finding for Castroneves on FUSA's breach of contract claim, for FUSA on Castroneves' counterclaims, and for Fittipaldi on the third-party complaint. Thus, no money damages were awarded to either party. FUSA's appeal follows raising two issues for this court's consideration.
First, FUSA contends that the trial court abused its discretion by allowing attorney Alan Miller to give expert testimony *185 where Castroneves failed to designate him as an expert witness, thereby unduly prejudicing FUSA and the outcome of the case.
The parties do not dispute that Alan Miller was a disclosed witness and that he was deposed by FUSA prior to trial. The parties do, however, disagree as to whether a specific portion of the testimony he gave at trial was "expert" testimony, whether the objection to Miller's testimony was properly preserved, and whether Miller's testimony unduly prejudiced FUSA or the outcome of the case.
At trial, attorney Miller testified that the Ilmor Agreement "didn't provide anything in the way of terms and conditions," was "poorly drafted," and "was a very ill-advised agreement." Four to five questions after making these statements, FUSA's counsel objected to this testimony and requested a sidebar conference. Immediately prior to the sidebar, Miller had testified that the Ilmor agreement "was a driver's nightmare," which caused FUSA's counsel to object and, in that instance, the trial court sustained the objection.
During the sidebar conference, FUSA's counsel objected to Miller's testimony on the ground that it was expert testimony by someone not previously designated as an expert. Because of the closeness in time between Miller's testimony and counsel's objection, we believe that the objection was timely and that the issue is preserved for appellate review. See, e.g., Barrett v. State, 649 So.2d 219, 221 (Fla.1994); Jackson v. State, 451 So.2d 458, 461 (Fla.1984).
Generally, to preserve an issue for appellate review, counsel is required to object contemporaneously with the offered testimony. Fincke v. Peeples, 476 So.2d 1319 (Fla. 4th DCA 1985). The purpose for requiring a contemporaneous objection is to put the trial judge on notice of a possible error, to afford an opportunity to correct the error early in the proceedings, and to prevent a litigant from not challenging an error so that he or she may later use it as a tactical advantage. Crumbley v. State, 876 So.2d 599 (Fla. 5th DCA 2004); Fincke, 476 So.2d at 1322. In this case, FUSA's objection was sufficiently timely to afford the trial court an opportunity to address the issue.
In response to the objection, Castroneves' counsel stated that Miller's testimony was "factual." The trial court found that Miller functioned as Castroneves' lawyer and "what he did and why he did it as his lawyer is factual," thereby denying FUSA's objection. The court added that it "will take it on a question by question basis." From this point forward, no "expert" testimony was allowed over objection.
We find that attorney Miller's testimony concerning the quality of Castroneves' prior contracts was "expert" testimony and was not factual in nature. While attorney Miller properly testified as a fact witness concerning the course of action he took on behalf of Castroneves, his testimony regarding the legal quality of Castroneves' prior agreements crossed the line into expert testimony. Miller's legal conclusions that the Ilmor agreement "didn't provide anything in the way of terms and conditions," was "poorly drafted," and "was a very ill-advised agreement" depended on the use of his legal experience and specialized training, without which he would not be qualified to render this opinion. Such testimony is only admissible as expert testimony under section 90.702, Florida Statutes (1999). Accordingly, the trial court should have sustained the objection and excluded that portion of Miller's testimony.
Castroneves' reliance on Frantz v. Golebiewski, 407 So.2d 283 (Fla. 3d DCA 1981) *186 is misplaced. Castroneves contends that Miller's testimony was akin to that of a "treating physician," which has been held to be non-expert testimony. Ryder Truck Rental, Inc. v. Perez, 715 So.2d 289 (Fla. 3d DCA 1998); Carpenter v. Alonso, 587 So.2d 572 (Fla. 3d DCA 1991)(treating physician is not subject to trial court's limitation of one expert witness per side in medical malpractice suit); Frantz v. Golebiewski, supra. In those cases, we have held that "treating physicians" are not subject to discovery rules governing expert witnesses because they did not acquire their expert knowledge for the purpose of litigation but rather simply in the course of attempting to make their patients well. Under such circumstances, the witness is typically testifying as the treating physician concerning his or her own medical performance on a particular occasion and is not opining about the medical performance of another. Moreover, the holdings in those cases address the categorization of treating physicians as ordinary witnesses but do not address the limits of such testimony.[1]
In this case, we find that the contested portions of Miller's testimony were not similar to the testimony of "treating physicians" and, in any event, were well outside the parameters of ordinary witness testimony. For example, as a trained attorney advising a client on the termination of a legal agreement, it cannot be said that Miller did not acquire his expert knowledge for the purpose or in anticipation of litigation. In fact, the contested portions of Miller's testimony are better analogized to medical malpractice cases where a party employs a medical doctor to testify concerning whether or not medical treatment by a prior doctor constituted malpractice. Cohen v. Burger, 769 So.2d 466, 466 (Fla. 4th DCA 2000)(expert medical evidence is required to support a claim for medical malpractice); Robbins v. Newhall, 692 So.2d 947, 949 (Fla. 3d DCA 1997).
Although we find it was error for the trial court to allow Miller's expert testimony, we do not believe that this testimony unduly prejudiced FUSA or the outcome of the case. See Binger v. King Pest Control, 401 So.2d 1310 (Fla.1981).
Unlike Capital Bank v. G & J Investments Corp., 468 So.2d 534 (Fla. 3d DCA 1985), upon which FUSA relies, the proof of Castroneves' claims did not turn on Miller's expert testimony. In Capital Bank, supra, this court reversed a jury verdict on the basis that the trial court permitted one party to solicit expert testimony from a witness not previously identified as an expert. However, the court expressed its reasoning as follows:
Without the expert testimony, G & J's proof as to the order of events  that acceptance of the instrument for payment preceded the stop payment acknowledgment  was based on circumstantial evidence.
Capital Bank, 468 So.2d at 535.
FUSA urges that reversal is warranted in this case, as in Capital Bank, because the undisclosed expert testimony was critical to the claims being litigated. We agree that reversal of a jury verdict is entirely appropriate in cases involving critical undisclosed expert testimony that goes to the heart of the litigation. Luis v. State, 851 So.2d 773 (Fla. 2d DCA 2003); Rose v. Madden & McClure Grove Serv., 629 So.2d 234 (Fla. 1st DCA 1994).
*187 However, in this case, Castroneves' claims that he properly terminated the contract with FUSA did not depend on Miller's expert testimony. Instead, his claims depended on evidence and testimony regarding numerous promises that he alleged were broken by Fittipaldi (including Fittipaldi's failure to satisfy the $1 million guaranty), Fittipaldi's unavailability, and Fittipaldi's lackluster efforts on Castroneves' behalf. The six-day trial did not center on the quality of the legal contracts executed during FUSA's relationship with Castroneves. Under the facts of this case, we do not believe that Miller's testimony unduly prejudiced appellant or the outcome of the case.
FUSA also argues that it was surprised by Miller's expert testimony. FUSA again relies on Capital Bank, where this court emphasized the surprise nature of the expert's testimony, stating that it condemned such "ambush" tactics. Capital Bank, 468 So.2d at 535. However, in the instant case, Miller had previously testified during his deposition that "it was pretty clear to me whoever drafted and negotiated that agreement [between Hogan and Castroneves] did not do a very good job for Mr. Castroneves." In light of this testimony, FUSA's counsel could have sought pre-trial relief from the court by seeking to limit the scope of Miller's testimony through a motion in limine or by having Miller designated as an expert witness. See Buy-Low Save Ctrs., Inc. v. Glinert, 547 So.2d 1283 (Fla. 4th DCA 1989)(purpose of a motion in limine is to prevent the introduction of improper evidence, the mere mention of which at trial would be prejudicial); Dailey v. Multicon Dev., Inc., 417 So.2d 1106 (Fla. 4th DCA 1982). Since attorney Miller had previously testified concerning the poor quality of Castroneves' prior agreements, FUSA can hardly claim it was surprised or ambushed by Miller's consistent trial testimony.
In FUSA's second point on appeal, FUSA argues that the trial court erred by allowing Castroneves' counterclaims (except for the count seeking declaratory relief) and third-party complaint to be considered by the jury. FUSA contends that the trial court should have granted its motion for directed verdict because Castroneves failed to show proof of damages. In the instant case, the issue is moot as the jury resolved Castroneves' counterclaims in FUSA's favor. Kinnebrew v. KMart Corp., 755 So.2d 187 (Fla. 3d DCA 2000); see Maksad v. Kaskel, 832 So.2d 788 (Fla. 4th DCA 2002).
Accordingly, we affirm.
FLETCHER, J., concurs.
COPE, J. (specially concurring).
I concur in the result. I join the majority opinion except for the analysis of whether certain testimony given by attorney Alan Miller was expert in nature, requiring attorney Miller to be listed as an expert witness.
FUSA and Castroneves were parties to a Management Agreement. That agreement could be terminated by Castroneves for good cause. Attorney Miller became the agent for Castroneves on November 1 or 2, 1999. On November 3, Castroneves sent a letter terminating the Management Agreement. The letter (drafted by attorney Miller) set forth five specific reasons for the termination.
FUSA filed suit against Castroneves, claiming that Castroneves did not have good cause for termination of the Management Agreement. FUSA argued that Castroneves had breached the parties' contract by discharging FUSA without good cause, and that FUSA was therefore owed compensation by Castroneves. FUSA also maintained that attorney Miller had stolen Castroneves away from FUSA as a client, *188 and that there had been no good reason for the change in agent representation.
As the case unfolded, attorney Miller was clearly an important fact witness regarding the sequence of events by which he became Castroneves' agent and Castroneves discharged FUSA. As far as pertinent here, at the deposition of attorney Miller, FUSA asked attorney Miller what documents he had reviewed and what information he had obtained prior to drafting the November 3 letter by which Castroneves terminated FUSA as his agent ("the November 3 letter"). At his deposition, attorney Miller stated that he had looked at two agreements: the Hogan Agreement and the Management Agreement between FUSA and Castroneves.
At trial, however, attorney Miller stated that he had looked at three agreements: the two previously mentioned plus the Ilmor Agreement. TR. 1329. Attorney Miller then testified, as the majority opinion explains, in unfavorable terms about the Ilmor Agreement. TR. 1329-32.
FUSA eventually objected and requested a sidebar conference. At the sidebar conference, FUSA explained that in deposition attorney Miller had only mentioned the two agreements (Hogan Agreement and the Management Agreement), and did not mention the Ilmor Agreement. TR. 1332. As to this discrepancy, FUSA stated that this discrepancy would be addressed on cross-examinationand did so.[1]
FUSA went on to argue at the sidebar conference that it was impermissible for attorney Miller to offer any commentary about whether the Ilmor Agreement was a good agreement or bad agreement, because this was undisclosed expert testimony. After hearing the parties' argument the following occurred:
THE COURT: At this point, I don't disagree that it's factual testimony. I do have a problem with the inconsistency in his deposition.
. . . .
THE COURT: If a doctor comes in and testifies as to his treatment of a patient, that's fact testimony. He comes in here and says this is what I looked at. This is what I did, and this is what I did. That's fact testimony.
[FUSA'S COUNSEL]: Well, he can come in and say I looked at the contract, and I concluded he had a basis for termination. He can't then say here was what my basis is, because if the doctor[s] comes in and testifies that, you know, I treated him and this was the cause of his injury, that's expert testimony.
THE COURT: If the doctor says I ran these and these tests, these and these tests said X, Y and Z, and consequently I did A, B and C, that's his treatment. He looked at it. I saw X, Y and Z and consequently I did A, B and C.
. . . .
THE COURT: No, but he functioned as his lawyer and, factually, what he did and why he did it as his lawyer is factual, and I will take it on a question by question basis.
TR. 1338-40.
Evidentiary questions are directed to the sound discretion of the trial judge, and are reviewable here only for abuse of discretion. See Ashley v. State, 370 So.2d 1191, 1194 (Fla. 3d DCA 1979). The trial court's ruling on the evidentiary objection was well within the court's discretion.
In Frantz v. Golebiewski, 407 So.2d 283 (Fla. 3d DCA 1981), this court rejected the *189 argument which appears to be embraced by the majority opinion in this case. In Frantz this court explained (in the context of a dental malpractice action) that "a treating doctor ..., while unquestionably an expert, does not acquire his expert knowledge for the purpose of litigation but rather simply in the course of attempting to make his patient well." Id. at 285. This court ruled that a treating dentist was not required to be listed as an expert and instead was "to be `treated as an ordinary witness.'" Id. (citations omitted).
That analysis is squarely applicable here. Attorney Miller had, by virtue of his legal education and law practice, special expertise. In this case, however, he was an ordinary fact witness because he had been hired by Castroneves to be his successor agent. Attorney Miller testified about his consultations with Castroneves and about the steps he took in that representation. At the time relevant here, that included review of the Ilmor Agreement. On that issue, Attorney Miller was a fact witness, not an expert witness. The trial court's ruling was entirely correct.
NOTES
[1] It is entirely possible that even a treating physician's testimony could cross the line into expert testimony.
[1] On cross-examination attorney Miller explained that he had either misspoken or misunderstood the question at his deposition. TR. 1423. Attorney Miller stated that he necessarily had a copy of the Ilmor Agreement on November 3 and 4, because he drafted other correspondence which specifically referenced or quoted that agreement. Id. at 1424-25.