# SIXTH DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

Case No. 6D2023-2853
Lower Tribunal No. 2018-CA-013196-O

_____

KRISTOPHER RICHARDSON,

Appellant,

v.

DAERI TENERY,

Appellee.

_____

Appeal from the Circuit Court for Orange County.
Vincent Falcone, III, Judge.

October 21, 2025

STARGEL, J.

Kristopher Richardson appeals the final judgment entered in favor of Daeri Tenery on her complaint for damages arising from an automobile accident. Richardson disputed causation, permanency, and damages. The jury awarded $220,100 in past medical expenses, $1,000,000 in future medical expenses, $300,000 in past pain and suffering, and $1,200,000 in future pain and suffering, for a total verdict of $2,720,100. Richardson raises four issues, one of which we find to

have merit.[1]  We agree with Richardson that the trial court committed reversible error by allowing Tenery's treating physician to offer an undisclosed expert opinion regarding her future medical expenses.  Due to the significance of this evidence, we cannot conclude that the error was harmless.  Accordingly, we reverse and remand for a new trial on future damages.

## Background

After the accident, Tenery treated with physiatrist Dr. Santo BiFulco.  Tenery's Disclosure of Expert Witnesses listed Dr. BiFulco as a "Treating Physician" and "non-retained expert" who was expected to testify about his treatment of Tenery and opine on "causation and/or damages, including, but not limited to, diagnoses, prognosis, impairment, permanency, disability, aggravation of any pre-existing condition, costs, reasonableness, necessity and relationship of past and future medical care."  The disclosure stated further:

> This non-retained expert has reviewed any and all medical records pertaining to the care and treatment received by the plaintiff.
>
> For further explanation please see their medical records chronicling his treatment of Plaintiff, already in Defendant's possession.  However, Plaintiff does not intend to limit these treating physicians' testimony to the verbatim language contained in their medical records.
>
> This physician has rendered reports of his medical treatment and/or radiological reads, and Plaintiff defers to his reports and/or testimony as to a summary of the subject matter of their testimony, as

---

[1] We reject the remainder of Richardson's arguments on appeal without further discussion.

2

well as the substance of the facts and opinions this physician may have. None of these medical records were prepared in anticipation of litigation.

Richardson subpoenaed Dr. BiFulco's records for Tenery on multiple occasions, the last of which he received approximately one month before trial. Richardson also served expert discovery, but Tenery objected as to those individuals referenced in her expert witness disclosure who were listed as treating physicians. While some of the records Richardson ultimately received from Dr. BiFulco referenced medical treatments Tenery would require in the future, the records did not contain a comprehensive life care plan or any specific projections of the cost of her future treatment. For instance, one record from February 15, 2019, referenced "[d]iscuss future cost options" but did not list any actual treatment costs. Another record, dated June 10, 2019, contained a section titled "Future Care Needs (Categories of Care)" listing several categories of future treatment but did not include any associated costs.

In January 2023, Richardson filed an omnibus motion in limine seeking, among other relief: (1) to preclude Tenery's retained experts from testifying about specific opinions not set forth in their reports, deposition testimony, or in expert disclosures and expert discovery responses; (2) to preclude Tenery's treating physicians from testifying as to liability, causation, aggravation of any prior injuries, or Tenery's future prognosis and impairment; and (3) to limit the testimony of

3

Tenery's treating physicians to opinions based on their own medical records. More specifically, he argued:

> [T]his motion seeks to limit Santo Steven BiFulco from serving as a *de facto* expert witness. In this case, Dr. BiFulco was listed as a treating physician and Plaintiff has failed to respond to any expert discovery regarding Dr. BiFulco on those grounds. From review of Dr. BiFulco's records, Dr. Bifulco was paid a $5,000 retainer, has been sent all of Plaintiff's medical records, and has evaluated the Plaintiff for the purpose of preparing a lifecare plan for which he is expected to testify at trial.

Richardson's memorandum of law in support of the motion alleged that defense counsel had seen transcripts from other lawsuits in which Dr. BiFulco was a witness "where at the request of Plaintiff's counsel, voluminous additional records were reviewed or new demonstrative exhibits were prepared on the eve of trial, and new opinions and demonstratives were presented at trial that had not been previously disclosed or were disclosed after the close of discovery." Attached to the supporting memorandum was invoice # 1967 from BiFulco Medical Group, dated June 25, 2018, reflecting a payment received in the amount of $5,000. The bottom of that invoice states: "Expert analysis does not begin until payment is received. Reports will not be delivered until payment is received. See Retainer Agreement (will be sent separately)."

Tenery responded to the motion in limine arguing that Richardson was attempting to mislead the court by suggesting that Dr. BiFulco was paid by plaintiff's counsel and asserting that Dr. BiFulco had not performed a life care plan in the case.

4

She argued that it was disclosed that Dr. BiFulco would opine as to future medical needs and reasonable costs of treatment, among other things, but that despite knowing what Dr. BiFulco was prepared to opine to, at no point did Richardson choose to take his deposition.

The trial court ultimately granted Richardson's motion in part, ruling that treating physicians could not opine as to liability but that they "may opine as to causation, aggravation, permanency, prognosis, the future course of treatment, and similar matters, provided that the opinions were in fact reached in the course of formulating a diagnosis or rendering treatment." However, the court indicated that it would entertain a timely objection or ore tenus motion to the extent Richardson believed particular opinions were developed for litigation purposes and not for diagnosis or treatment. The court noted: "Generally speaking, treaters who were not also disclosed as retained experts will be limited to opinions actually developed during the course of treatment."

In March 2023, the case went to trial. During trial, Richardson objected to the admission of the "Categories of Care" record "as being essentially a narrative report of the categories of care needed that would typically appear in a lifecare plan." Richardson also objected to Dr. BiFulco testifying as to the cost of any future medical treatment outside of his own specialty, arguing that "he should not be able to do the same scope that he would do as a life care planner just by labeling him as a treating doctor." In response, Tenery argued that the record should be admitted

5

because it indicated that Dr. BiFulco and Tenery had discussed future treatment costs; Dr BiFulco was familiar with Tenery's medical records even if he did not perform certain aspects of her treatment; and Dr. BiFulco was disclosed as giving those opinions, but Richardson still chose not to take his deposition.

To resolve the issue, the trial court had the parties proffer Dr. BiFulco's testimony. Dr. BiFulco stated that he treated Tenery, reviewed her medical records from other providers, and formulated opinions on future care and discussed future costs with her in the course of treatment. Dr. BiFulco stated he was not retained as an expert to prepare a life care plan; however, because of his education, training, and experience, when he has a doctor-patient relationship, he is able to formulate opinions as to future care costs. Dr. BiFulco admitted he did not generate any document or notes reflecting future care costs until "[t]wo nights ago, as I was preparing to testify." He added, "it wasn't until I knew I was going to be testifying in trial that I actually added everything up. Up until that point, we had just been discussing costs in general categories." The result was a typed Excel spreadsheet identifying thirty-two categories of future treatment needs with cost breakdowns upon which Dr. BiFulco would ultimately base his testimony.

When questioned by defense counsel, Dr. BiFulco initially denied that his calculation of future treatment costs was essentially a handwritten life care plan. He stated, "it's definitely not a lifecare plan report, it is notes that I've taken in anticipation that I would be asked about her care and treatment. . . . [I]t's not the

6

same as the chart that I generate when I generate a lifecare plan." However, when pressed as to whether he would have provided the jury with the same type of information if he had been retained as a life care planner, he admitted that the information was similar:

> Well, I was not retained as a lifecare planner in this case, but I guess, yes, that information is similar in that we're talking about Ms. Tenery's injuries, what she has, what she will need, what the duration of that care will be over her lifetime. So, yes, in that regard, there are some similarities.

Following the proffer, the trial court overruled Richardson's objection and found that no *Binger*[2] violation had occurred because Dr. BiFulco's disclosure referenced costs and future medical care, and the medical records referenced discussions about the same. Thus, the trial court found that "there was enough information there that if there was doubt over the kind of testimony that he would be providing, that a deposition could have been taken; those issues could have been investigated in a fulsome manner in a deposition." The trial court then addressed the issue of "whether Dr. BiFulco is a true treater or sort of a disguised retained lifecare planner." Relying on *Gutierrez v. Vargas*, 239 So. 3d 615 (Fla. 2018), the court found that Dr. BiFulco's opinions on future medical treatment and costs were developed in the course of treatment and that he "added everything up and calculated it in anticipation of being called to testify about it," which did not "turn[] him into

---

[2] *Binger v. King Pest Control*, 401 So. 2d 1310 (Fla. 1981).

7

an expert witness or turn[] this into a situation where opinions are being developed for trial."[3]

The "Categories of Care" record was then admitted into evidence over objection along with the rest of Dr. BiFulco's records. Dr. BiFulco testified to the jury that he formulated opinions as to future care based on his treatment of Tenery, as well as his "knowledge of what she's been doing and seeing all her medical records," and that he performed a cost analysis based on his opinions the week of trial after Tenery's attorneys reached out to inform him they would be calling him to testify. Dr. BiFulco explained that his methodology for a cost analysis involves looking at reliable sources to determine what providers charge for a specific procedure in a geographic area in today's dollars. Because he is a physician life care planner, he is "very familiar with the cost for medical care in the Central and West Florida area," and he "look[s] at those costs on a regular basis." His sources include cost tables and databases like Physicians' Fee Reference, which looks at what physicians and imaging centers charge for facilities, and other databases that look at costs for medications and surgical or invasive procedures.

Dr. BiFulco then testified in detail about six categories of future care Tenery would require—routine medical evaluations, therapeutic evaluations, therapy,

---

[3] The trial court would later state that the analysis of whether Dr. BiFulco should be allowed to testify about future medical treatment and costs "turned heavily on him falling into the . . . 'treating physician' category, as opposed to the retained expert category."

diagnostic tests, pharmacology, and invasive procedures—each of which included various types of evaluations or treatments, and the costs associated with each based on her life expectancy. In total, Dr. BiFulco testified that Tenery would require future medical treatment at a cost of $2,309,868.

On cross, defense counsel inquired further into the issue of whether Dr. BiFulco was paid by Tenery's counsel's law firm. Dr. BiFulco testified that he typically requires a $5,000 retainer to testify as an expert but that he was not retained as an expert in this case. Richardson's counsel showed Dr. BiFulco invoice # 1967 and asked if he was willing to work on Tenery's case because he received payment from Tenery's counsel. Tenery objected, and the parties approached the bench. Richardson showed the trial court discovery responses from a different lawsuit in which Dr. BiFulco had been retained as a life care planner. These included a check registry showing that Tenery's counsel had paid invoice # 1967 to Dr. BiFulco's office in the amount of $5,000 on July 27, 2018. With the court's permission, Richardson attempted to use the check registry to refresh Dr. BiFulco's recollection about the source of the $5,000 payment, but Dr. BiFulco stated that the document did not refresh his recollection.

After the verdict, Richardson filed a motion for new trial raising multiple issues, including those described above. The trial court denied the motion on all issues except as it related to Dr. BiFulco and ordered Tenery to respond to that portion of the motion. Tenery's response argued that Dr. BiFulco was properly

9

disclosed as a treating physician and that the $5,000 invoice for her medical treatment was inadvertently sent to and paid by Tenery's counsel. She attached affidavits from Dr. BiFulco and her counsel, both of whom attested that they first learned of the inadvertent payment during Dr. BiFulco's testimony, and that the payment had since been refunded.

Following a hearing which focused primarily on the effect of the $5,000 payment, the trial court entered an order denying the motion for new trial in its entirety. The court found that the issue of the $5,000 payment was unpreserved because Richardson's counsel ended the inquiry after unsuccessfully attempting to refresh Dr. BiFulco's recollection and had requested no further relief on the issue. As a result, the court did not have an opportunity to address the issue or hear argument from the parties on whether the payment should be allowable for impeachment purposes or whether Dr. BiFulco's designation as a treating physician should be revisited. This timely appeal follows.

## Analysis

Richardson argues that the trial court erred by allowing Tenery to create a "super expert" who offered undisclosed expert testimony regarding future medical treatment and costs while being shielded from expert discovery by virtue of his label as a treating physician. This argument is well-taken.

Tenery's expert witness disclosure listed Dr. BiFulco as a "Treating Physician" and "non-retained expert" who was expected to opine on "causation

10

and/or damages, including, but not limited to, diagnoses, prognosis, impairment, permanency, disability, aggravation of any pre-existing condition, costs, reasonableness, necessity, and relationship of past and future medical care." Throughout the course of the litigation, Tenery considered Dr. BiFulco to be a treating physician only, thus shielding him from expert discovery concerning any financial incentive for his testimony. *See Worley v. Cent. Fla. YMCA, Inc.*, 228 So. 3d 18, 23 (Fla. 2017) (holding that the financial relationship between a law firm and plaintiff's treating physician is not discoverable). Dr. BiFulco was then allowed to offer specific opinions as to future medical treatment and costs, which he acknowledged was similar to the information he would provide if he had been retained as a life care planner.[4] None of the future treatment costs to which he testified were contained in the medical records or otherwise disclosed in discovery.

In *Binger*, the Florida Supreme Court held that where a party fails to disclose a witness by the deadline set forth in a pretrial order, the trial court must consider prejudice to the objecting party before exercising its discretion to admit the undisclosed witness's testimony.[5]  401 So. 2d at 1314-15.  "Prejudice in this sense

---

[4] "Life care planners prepare comprehensive projections of future medical care and treatment needs to aid economists in calculating the present value of future medical care and treatment.  In doing so, they necessarily rely on physicians' recommendations." *Olges v. Dougherty*, 856 So. 2d 6, 9 (Fla. 1st DCA 2003).

[5] Our sister courts have interpreted *Binger*'s holding to also limit a trial court's discretion by requiring a finding of prejudice to the objecting party before excluding an undisclosed witness. *See, e.g.*, *Allstate Prop. & Cas. Ins. Co. v. Lewis*, 14 So. 3d 1230, 1234 (Fla. 1st DCA 2009); *State Farm Mut. Auto. Ins. Co. v. Thorne*, 110 So.

refers to the surprise in fact of the objecting party, and it is not dependent on the adverse nature of the testimony." *Id*. at 1314. Other relevant factors may include "(i) the objecting party's ability to cure the prejudice or, similarly, his independent knowledge of the existence of the witness; (ii) the calling party's possible intentional, or bad faith, noncompliance with the pretrial order; and (iii) the possible disruption of the orderly and efficient trial of the case (or other cases)." *Id*.

A significant point of contention in this case is whether Dr. BiFulco was truly acting as a treating physician, or rather as an expert witness, when testifying as to his opinions regarding Tenery's future medical treatment and costs. In making this determination, our analysis focuses not on the proponent's label for a witness, but on the substance of the testimony to be elicited. *See Pitts v. Neptune*, 396 So. 3d 619, 621 (Fla. 1st DCA 2024) ("A party's label for a witness matters little. Instead, the substance of the testimony drives the analysis."); *see also Tillman v. Sweat*, 398 So. 3d 465, 468 (Fla. 5th DCA 2024) ("Tillman's description of certain experts as 'treating physicians' is not determinative. Rather, it is the subject matter of the witnesses' intended testimony as set forth in the disclosure that guides our determination." (citations omitted)).

"Testimony given by treating physicians blurs the boundary between fact testimony and expert testimony because treating physicians and medical experts both

---

3d 66, 71 (Fla. 2d DCA 2013). Because this case does not present a trial court's exclusion of undisclosed testimony, we take no position on this point.

12

have 'scientific, technical, or other specialized knowledge' which informs their testimony." *Gutierrez*, 239 So. 3d at 622 (quoting § 90.702, Fla. Stat. (2017)). Whereas an expert witness assists the jury by testifying regarding technical matters about which the jury does not have basic knowledge, a treating physician testifies as a fact witness concerning his or her own treatment of a party based on the physician's personal knowledge. *Id.* While a treating physician's testimony necessarily involves the exercise of the physician's specialized medical knowledge, *id.*, treating physicians "do[] not acquire [their] expert knowledge for the purpose of litigation but rather simply in the course of attempting to make [their] patient well," *Frantz v. Golebiewski*, 407 So. 2d 283, 285 (Fla. 3d DCA 1981). As *Gutierrez* explains:

> Treating physicians are limited to their medical opinions as they existed at the time they were treating the plaintiff, while an expert may form new opinions in order to help the trier of fact decide the case. Although a treating physician may possess the same qualifications as an expert witness, treating physicians form medical opinions in the course of rendering treatment and may therefore testify to the fact that they formed those opinions, and explain why they did so, provided such testimony is otherwise admissible.

239 So. 3d at 622-23 (citation omitted).

But not all opinions formed by a treating physician during the course of treatment will be automatically admissible. *Id.* at 624. A treating physician's testimony can sometimes "cross the line into expert testimony," in which case the fact that the physician has treated the plaintiff does not prevent the physician from being considered an expert witness. *Id.* (first quoting *Fittipaldi USA, Inc. v.*

13

*Castroneves*, 905 So. 2d 182, 186 n.1 (Fla. 3d DCA 2005), and then citing *Tetrault v. Fairchild*, 799 So. 2d 226, 228 (Fla. 5th DCA 2001)).

> [T]he determination turns on the role played by the witness: if the treating physician gives a medical opinion formed during the course and scope of treatment in fulfillment of their obligation as a physician, then the physician is a fact witness, albeit a highly qualified one. If, however, the treating physician gives an opinion formed based on later review of medical records for the purpose of assisting a jury to evaluate the facts in controversy, the physician acts as an expert witness, and should be considered as such. *See* [*Lion Plumbing Supply, Inc., v. Suarez*, 844 So. 2d 768, 771 (Fla. 3d DCA 2003)] (holding it is improper for a treating physician to "serve[ ] as a conduit to place specialist testimony before the jury, or offer[ ] medical opinions based on specialist reports" when testifying as a lay witness rather than an expert).

*Id.* (third and fourth alterations in original).

In *Tillman*, the plaintiff filed an expert disclosure identifying four "treating physicians" who would testify about their respective treatment of Tillman and "offer opinions on causation and/or damages, including, but not limited to, diagnoses, prognosis, impairment, permanency, disability, aggravation of any pre-existing conditions, costs, reasonableness, necessity, and relationship of past and future medical care." 398 So. 3d at 467.[6] The defendant in *Tillman* had served discovery seeking information regarding potential financial bias of the "treating physicians," but Tillman objected, arguing that such discovery was prohibited by *Worley*. *Id.*

---

[6] The plaintiff in *Tillman* was also represented by the law firm representing Tenery in this matter.

14

After the trial court entered orders compelling said discovery, Tillman sought certiorari relief. *Id.* at 467-68.

The Fifth District denied Tillman's petition, holding that the physicians Tillman disclosed as "treating physicians" were actually "hybrid experts" who were subject to financial-bias discovery because they "intend[ed] to offer opinion testimony exceeding the scope permissible for a fact witness treating physician." *Id.* at 470 ("A treating physician is properly characterized as a 'hybrid witness' when 'such a witness [provides] testimony on the plaintiff's medical history and course of treatment, while also offering opinions regarding future medical treatment and permanency.'" (alteration in original) (quoting *Orthopedic Care Ctr. v. Parks*, 155 So. 3d 377, 382 n.5 (Fla. 3d DCA 2014))). The Fifth District explained:

> [A]ccording to the expert witness disclosure, these physicians will offer testimony on their "care and treatment of [Tillman], and offer opinions on causation and/or damages, including, but not limited to, . . . impairment, permanency, disability . . . and relationship of past and future medical care." Such opinion testimony exceeds the scope of a fact witness treating physician whose testimony relates to diagnosis and treatment of injury or disease. This intended testimony addresses litigation-related issues.
>
> Further, according to Tillman's expert witness disclosure, these treating physicians will be called upon to offer testimony based in part on their review of "any and all medical records pertaining to the care and treatment received by [Tillman]." Testimony based on records not generated or relied upon in the care and treatment by each treating physician goes beyond the function of a fact witness treating physician and into the realm of an expert witness.

15

*Id.* at 469-70 (second and third alterations in original); *see also Pitts*, 396 So. 3d at 620-21 (rejecting challenge to order compelling financial-bias discovery regarding plaintiffs' so-called "hybrid expert/treating physicians" where those physicians had been given litigation binders containing plaintiffs' medical records from other providers and planned to testify based on their review of those records and their treatment of plaintiffs).

Following *Tillman*, we find that a similar analysis is appropriate here. Tenery's disclosure of Dr. BiFulco is worded almost identically to the disclosure of the four "treating physicians" in *Tillman*. Dr. BiFulco's opinions as to Tenery's future medical treatment and costs, including any opinions based on his review of her medical records from other providers, exceeded the scope of a fact witness treating physician and crossed the line into expert testimony. Clearly, Dr. BiFulco's work in performing a cost analysis for the entirety of Tenery's future medical treatment just days before he was called to testify was done for the purpose of assisting the jury in determining the amount of damages at trial. This is the work of an expert witness.

We further conclude that Richardson was prejudiced by the admission of this evidence. Allowing Tenery to spring Dr. BiFulco's cost analysis on Richardson at trial left Richardson at an unfair disadvantage in preparing for cross-examination and prevented him from potentially rebutting the evidence with the testimony of his own expert witness. *See, e.g., Miller v. Conney*, 413 So. 3d 306, 309-10 (Fla. 1st

16

DCA 2025) (holding that admission of cost estimate for future medical treatment disclosed for the first time at trial was "a classic example of surprise and trial by ambush"); *Gurin Gold, LLC v. Dixon*, 277 So. 3d 600, 604 (Fla. 4th DCA 2019) ("[T]he lawyers should have been able to rely on the discovery cut-offs and not be 'ambushed' by additional undisclosed testimony without the benefit of gathering their own witness to rebut this new undisclosed testimony."); *Citizens Prop. Ins. Corp. v. Vazquez*, 260 So. 3d 396, 398 (Fla. 3d DCA 2018) ("When a party presents evidence at trial not previously seen or heard by the opposing party, the admission of that evidence is inherently prejudicial."). Additionally, Tenery's failure to properly disclose Dr. BiFulco as an expert prevented Richardson from obtaining expert discovery regarding any financial relationship between Dr. BiFulco and Tenery's counsel.[7]

The fact that Dr. BiFulco only transcribed his opinions concerning future treatment costs two days before he testified does not excuse the nondisclosure. Assuming Dr. BiFulco truly developed these opinions in the course of treatment as he testified, then Tenery had every opportunity to ensure that his opinions were contained in the medical records or otherwise properly disclosed in accordance with her discovery obligations. As alluded to above, the fact that Dr. BiFulco only

---

[7] The trial court properly determined that any legal issues regarding evidence of the $5,000 payment to Dr. BiFulco were unpreserved. Any such issues have no impact on our decision in this appeal.

17

performed a cost analysis days before his testimony after learning from Tenery's counsel that he would be called as a witness only further suggests that his opinions were developed not for the purpose of diagnosis and treatment but rather in anticipation of litigation. *See Gutierrez*, 239 So. 3d at 624 ("If a treating physician testified to a medical opinion formed for the purpose of litigation rather than treatment, then the mere fact that the physician once treated the plaintiff would not prevent that doctor from being considered an expert witness.").

Tenery maintains that her disclosure of Dr. BiFulco was sufficient and cites to *Clair v. Perry*, 66 So. 3d 1078, 1079-80 (Fla. 4th DCA 2011), in which the Fourth District approved the admission of an undisclosed permanency opinion by the plaintiff's treating physician. Notably, however, the Fourth District in *Clair* declined to decide whether the physician's opinion constituted expert testimony or hold that a permanency opinion is always formulated in anticipation of litigation. *Id.* at 1079. Instead, the court held that the defense suffered no prejudice because, among other reasons, it had been provided with the physician's medical records "containing all the data upon which the doctor formed his permanency opinion." *Id.* at 1080. This is easily distinguishable from the present case, in which none of the data upon which Dr. BiFulco based his cost calculations were contained in the records disclosed.

Tenery also faults Richardson for failing to depose Dr. BiFulco if he wished to gather more information about the testimony he would be giving. But while the

medical records indicate that Dr. BiFulco and Tenery discussed treatment costs to some extent, there was no reason for Richardson to believe, based on the records disclosed, that Dr. BiFulco would take the stand prepared to offer a detailed projection of Tenery's future treatment costs akin to a life care plan. This was particularly true after Tenery stonewalled Richardson's request for financial-bias-related discovery regarding Dr. BiFulco on the grounds that he was a treating physician only and later argued in opposition to Richardson's omnibus motion in limine that Dr. BiFulco was not retained by her attorneys and that he never performed a life care plan in the case. These same facts also suggest bad faith on Tenery's part in failing to properly disclose the nature and substance of Dr. BiFulco's testimony. *See Binger*, 401 So. 2d at 1314.

## Conclusion

For these reasons, we conclude that the trial court abused its discretion in finding that no *Binger* violation occurred when Tenery offered the undisclosed expert opinion of Dr. BiFulco regarding her future medical treatment and costs.[8] We hold that Richardson is entitled to a new trial on the issue of Tenery's future

---

[8] We cannot find this error harmless. *See Special v. W. Boca Med. Ctr.*, 160 So. 3d 1251, 1256 (Fla. 2014) ("To test for harmless error, the beneficiary of the error has the burden to prove that the error complained of did not contribute to the verdict. Alternatively stated, the beneficiary of the error must prove that there is no reasonable possibility that the error contributed to the verdict.").

damages.  Accordingly, we reverse and remand for a new trial on future damages.

In all other respects, we affirm the final judgment.

REVERSED in part; AFFIRMED in part; and REMANDED.

WOZNIAK and GANNAM, JJ., concur.


Kevin D. Franz, of Boyd & Jenerette, P.A., Boca Raton, and Jennifer A. Karr, of Boyd & Jenerette, P.A., Maitland, for Appellant.

Brian J. Lee, of Morgan & Morgan, Jacksonville, for Appellee.


NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING
AND DISPOSITION THEREOF IF FILED