832 So.2d 788 (2002)
Ali MAKSAD and Ann Knowles Maksad, Appellants,
v.
Stewart M. KASKEL, M.D., Stewart M. Kaskel, M.D., P.A., a Florida corporation, Joseph A. Colletta, M.D., Joseph A. Colletta, M.D., P.A., a Florida corporation, Neil M. Carpenter, M.D., and Tenet Health System Hospitals, Inc., d/b/a West Boca Medical Center, a foreign corporation, Appellees.
No. 4D01-3290.
District Court of Appeal of Florida, Fourth District.
August 28, 2002.
Rehearing Denied November 27, 2002.
*789 Philip D. Parrish of Philip D. Parrish, P.A., Law Office of Orlando R. Ruiz and Law Office of Jugo & Murphy, Miami, for appellants.
Mark Hicks and Dinah Stein of Hicks, Anderson & Kneale, P.A., Miami, for appellees Stewart M. Kaskel, M.D. and Stewart M. Kaskel, M.D., P.A.
Michael K. Mittelmark and Marc T. Millian of Michaud, Buschmann, Mittelmark, Millian, Blitz & Warren, P.A., Boca Raton, for appellees Joseph A. Colletta, M.D. and Joseph A. Colletta, M.D., P.A.
Louise H. McMurray and Michael A. Petruccelli of McIntosh, Sawran, Peltz & Cartaya, Miami, for appellee West Boca Medical Center.
WARNER, J.
Appellant, Dr. Ali Maksad, raises various claims of error in the conduct of this medical malpractice action in which the *790 jury found no negligence on behalf of his medical providers. We affirm.
Appellant, a cardiovascular surgeon who was self-medicated all of his life, retired and chose a primary care physician, Dr. Kaskel. During his first visit in September 1995, Dr. Kaskel noted signs suggesting a diagnosis of peripheral vascular disease, including a lack of pedal (foot) pulses but only treated appellant for a rash. In addition, due to the lack of other symptoms, Dr. Kaskel did not perform a detailed vascular examination or refer appellant to a vascular specialist.
In the ensuing months, appellant began experiencing increasing foot pain, despite taking Talwin (a powerful painkilling narcotic) for an unrelated problem. Appellant went to see Dr. Kaskel on November 15th and advised him of the pain he was experiencing on the bottom of his foot. Believing the pain was exertional, Dr. Kaskel recommended rest and referred appellant to an orthopedist. The pain increased, so appellant phoned Dr. Kaskel on November 17th and was prescribed moderate pain medication. By November 19th, the pain was so severe that appellant decided to go to the emergency room at West Boca Medical Center ("the hospital"). The testimony conflicted as to whether appellant noticed the severe pain around midnight or once he awoke that morning between 8:00 and 10:00 a.m. Regardless, appellant walked into the emergency room at 2:00 p.m.
The emergency room physician immediately diagnosed a vascular problem and contacted the hospital's on-call vascular surgeon, Dr. Colletta, a board certified general surgeon. After examining appellant and reviewing his tests, including one indicating that severe muscle damage had already occurred, Dr. Colletta advised appellant there was an arterial blockage requiring an embolectomy (a procedure to take out the blood clot). Dr. Colletta performed the embolectomy, administered urokinase (a chemical to treat blood clots), and also performed a fasciotomy (opening the leg to relieve pressure buildup from the return of blood). Although stimulation of the open leg indicated the muscles may already have been dead, Dr. Colletta still believed the foot was viable and could be saved by the urokinase, so he decided not to perform an arterial bypass.
Members of Dr. Colletta's practice group, including its board certified vascular surgeon, Dr. Motta, monitored appellant over the ensuing days and were initially encouraged. However, by November 22nd, Dr. Motta noticed a "foot drop," and by November 25th, appellant's foot had zero motor function. Because appellant's life was at risk due to the insufficient blood flow and resultant muscle necrosis, another member of their practice group amputated appellant's leg on November 27th.
Appellant sued Dr. Kaskel, Dr. Colletta, and the hospital for medical malpractice. He alleged Dr. Kaskel failed to diagnose his vascular problem and refer him to a specialist. He alleged Dr. Colletta failed to properly treat him by not performing an arterial bypass, which he believed would have saved his leg. Finally, he claimed the hospital improperly credentialed Dr. Colletta to perform vascular surgery and, instead, should have had a board certified vascular surgeon on call who could have performed an arterial bypass. The defendants all denied liability and asserted comparative negligence as an affirmative defense.
As can be expected in a medical malpractice action, the testimony of the experts at trial was conflicting. Appellant presented Dr. Gerald Sydorak, who testified that the defendant doctors' treatment fell below the standard of care and contributed to the preventable amputation. As to *791 Dr. Kaskel, Dr. Sydorak opined he should have either ordered vascular tests or referred appellant to a vascular specialist. As to Dr. Colletta, Dr. Sydorak believed his treatment on November 19th, including the embolectomy and urokinase administration, was appropriate but criticized Dr. Colletta for not performing a bypass when the leg began to deteriorate.
Both Dr. Kaskel's and Dr. Colletta's experts testified that their treatment was appropriate. Dr. Eugene Oddone testified that, given appellant's complaints and symptoms, Dr. Kaskel's diagnosis of an orthopedic problem was appropriate and that a vascular referral was not required. Dr. Richard McCann testified that appellant's delay in seeking treatment when the pain became severe on November 19th made salvaging his leg unlikely. Because a muscle cannot recover from a lack of circulation for more than four to six hours, and tests upon appellant's arrival at the hospital indicated significant muscle death, the deep leg muscles were likely irretrievable upon his delayed presentation. According to Dr. McCann, a bypass was never medically indicated.[1]
As to the hospital's negligence, the court refused to allow Dr. Sydorak to give his opinion. It found that he failed to establish his expertise in evaluating the standard of care for hospital credentialing in general and, in particular, the credentialing process in Florida hospitals. In spite of the lack of expert testimony, the court denied a motion for directed verdict on the credentialing claim against the hospital. Consequently, the court permitted Dr. Colletta to testify at length about his general surgical training which, according to the American Board of Surgery, "includes vascular surgery as one of the primary components." Dr. Colletta testified that, earlier in his career, he had performed 100 to 150 of the type of bypass appellant claimed he should have performed in this case. However, since Dr. Motta joined his practice group, only five to ten percent of Dr. Colletta's practice now involves vascular surgery.
At the conclusion of the evidence, the trial court denied appellant's motion for directed verdict on his comparative negligence. It also denied his request for a jury instruction that violating section 766.110, Florida Statutes (1995), regarding hospital procedures for selecting staff members, was evidence of negligence on the ground that the theory had not been pled. The jury returned a verdict finding no negligence on the part of any of the defendants, and the court entered judgment accordingly.
As a consequence of the jury's verdict, we can summarily dispose of three issues. Appellant claims the court should have granted a directed verdict on his comparative negligence. However, since the jury did not find any of the defendants negligent, it never reached the comparative negligence issue. Thus, any error in denying appellant's motion was harmless, and this issue is moot. See Kinnebrew v. KMart Corp., 755 So.2d 187, 188 (Fla. 3d DCA 2000). Even if we addressed the merits, we would still affirm because of the testimony that appellant's own actions in delaying his presentation to the hospital caused damage to his leg.
The jury's verdict also moots appellant's two issues relating to the hospital. Because Dr. Colletta was not negligent, the hospital's credentialing of him could not have proximately caused appellant's injuries. Thus, any error by the court in *792 refusing to permit Dr. Sydorak's credentialing testimony and in refusing to give the section 766.110 jury instruction is irrelevant.
Appellant next claims the court improperly permitted Dr. Colletta to bolster himself by testifying he has been voted a "top ten doctor" and has never had a bad outcome in a surgery case. This issue was not preserved. Appellant objected after Dr. Colletta already testified that no one has ever complained about his surgeries. In addition, Dr. Colletta testified to his status as a "top ten doctor" both before and after appellant's objection.
Even if preserved, the court did not err in allowing the testimony. In Insinga v. LaBella, 543 So.2d 209, 211-14 (Fla.1989), the supreme court held that a hospital could be liable for negligently granting privileges to independent contractor doctors. The court concluded hospitals have a duty to ensure that the doctors they have providing medical care have sufficient skill and qualifications.[2] In order to refute a corporate negligence claim of this type, a hospital must be allowed to demonstrate the privileged doctor's credentials. That is exactly what occurred in this case. While that same evidence also had the indirect effect of bolstering Dr. Colletta's credibility, which admittedly is generally improper, see, e.g., Liberatore v. Kaufman, 27 Fla. L. Weekly D1549, D1550 (Fla. 4th DCA July 3, 2002), that prejudicial effect did not outweigh the probative value in this case. Therefore, the trial court did not abuse its discretion in permitting Dr. Colletta to testify about his qualifications.
Appellant attempts to frame the issue in a different way. He argues his claim against the hospital did not rest on Dr. Colletta's qualifications as a general surgeon but, instead, on Dr. Colletta's lack of qualifications as a vascular surgeon. Thus, evidence of Dr. Colletta's qualifications as a general surgeon were irrelevant and erroneously admitted. Appellant's argument is unavailing. The hospital defended at trial that it properly credentialed Dr. Colletta because general surgeons are qualified to perform vascular surgery. To support that defense, it was entitled to demonstrate that Dr. Colletta was an eminently qualified general surgeon. Moreover, some of the testimony appellant challenges actually revealed that Dr. Colletta has not only had no complaints about his surgeries in general but also has had no complaints about his vascular surgeries. Admitting such testimony was not error.
Appellant next complains that the court erroneously allowed the defense to cross-examine Dr. Sydorak about appellant's self-medication by obtaining prescriptions from other physicians. Considerable testimony at trial revolved around appellant's self-medication with Talwin. He initially raised his Talwin use in his own testimony, discussing his self-medication and manner of obtaining prescriptions from doctor-friends. Appellant thus opened the door to cross-examination of Dr. Sydorak regarding Talwin use that may be relevant to issues in this case, such as Talwin masking pain. That masking could have caused delays in seeking medical attention and inhibited precise pain descriptions. However, appellant appropriately objected when the defense cross-examined Dr. Sydorak about whether it was wrong for other physicians to write appellant Talwin prescriptions without examining him. The trial court erroneously overruled the objection. While that specific cross-examination may have been outside the relevant issues for trial, we conclude that the reference was slight and the error was harmless.
*793 Finally, appellant seeks a new trial based upon numerous improper comments during closing arguments, including disparaging comments about his case. Generally, a mistrial or new trial should be granted only when counsel's arguments are so inflammatory and prejudicial that they deny the opposing party a fair trial. See Jeep Corp. v. Walker, 528 So.2d 1203, 1204 (Fla. 4th DCA 1988); accord Goodwin v. State, 751 So.2d 537, 547 (Fla.1999). We have carefully read the entire closing argument. While a few words and phrases in Dr. Colletta's two hour closing argument and one word of the hospital's closing argument may be objectionable, in the trial court's view they did not justify a new trial. We agree.
We affirm the final judgment.
HAZOURI and MAY, JJ., concur.
NOTES
[1] The parties' experts also disagreed over whether Dr. Kaskel should have advised appellant of his lack of pedal pulses and whether Dr. Colletta should have used an ankle brachial index to ascertain the blood pressure in appellant's ankle.
[2] This duty has been codified in what is now section 766.110(1), Florida Statutes (1995).