997 So.2d 1139 (2008)
Laura RUIMY, Appellant/Cross-Appellee,
v.
Flor N. BEAL, et al., Appellees/Cross-Appellants.
No. 3D07-533.
District Court of Appeal of Florida, Third District.
November 26, 2008.
Rehearing and Rehearing En Banc Denied February 3, 2009.
*1140 Grover & Weinstein, Marvin Weinstein, Joel S. Perwin, and Richard B. Rosenthal, Miami, for appellant/cross-appellee.
Luks, Santaniello, Perez, Petrillo & Gold, James P. Waczewski, Tallahassee; Dearman & Gerson, and Mark Dearman, Plantation, for appellees/cross-appellants.
Before GERSTEN, C.J., and RAMIREZ, J., and SCHWARTZ, Senior Judge.
PER CURIAM.
Affirmed. See Murphy v. Intl. Robotic Sys., Inc., 766 So.2d 1010 (Fla.2000) (stating that new trial is warranted where argument of counsel is determined to be improper, harmful, incurable, and damaging to trial fairness); McCain v. Fla. Power Corp., 593 So.2d 500 (Fla.1992) (holding that whether and to what extent defendant's conduct foreseeably and substantially caused injury is an issue to be determined by the jury based on the specific facts of the case).
RAMIREZ, J., (concurring).
This is an appeal of an order granting a new trial to the defendants/appellees after a jury awarded damages to the plaintiff, Laura Ruimy, of approximately $778,000. The jury found that the driver and the owner were each 50% at fault. The trial court overturned the verdict and granted a new trial for the stated reason that the cumulative effect of improper comments by plaintiff's counsel during closing argument denied the defendants a fair trial. Although I believe that the comments fell far short of the high threshold required to overturn a jury's verdict, I concur with the majority in affirming because the standard of review is abuse of discretion and, in view of the decision of the majority of this court, I cannot state that the trial judge was unreasonable. See Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980) ("If reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion. The discretionary ruling of the trial judge should be disturbed only when his decision fails to satisfy this test of reasonableness.").

I.
Ruimy, an 18-year-old student, was injured when struck by an automobile as she lawfully crossed a Miami Beach crosswalk. The vehicle was driven by defendant Alex Beal, and was owned by Alex's sister, co-defendant Flor Beal. Until the morning of trial, the sibling defendants used the same attorney, Mr. Daniel Santaniello. Their joint defense evidently did not present an ethical problem until the morning of trial. Alex's liability for the accident was never contested. He had driven into the crosswalk against the light, then fled the accident scene before the police arrived, leaving Ruimy lying semi-conscious in the street with, among other injuries, a fractured pelvis and spinal vertebrae, and multiple leg and foot fracturesan incident for which Alex was later criminally convicted. But on the morning of trial, Mr. Santaniello announced that there was a conflict of interest between the siblings, so he was withdrawing as counsel for Alex, and remaining as counsel only for Flor. Alex's new counsel, Mr. Mark Dearman, announced his appearance and formally admitted Alex's liability. Mr. Santaniello then advised the court that Flor would contest her own liability and contend that Alex had taken the car without permission.
Ruimy's counsel claimed to be surprised. The joint answer filed in this case had denied each and every allegation contained in plaintiff's complaint, then listed eighteen (18) affirmative defenses, the first of which *1141 was that United Automobile Insurance Company had timely tendered its insurance policy limits. During the two and a half years that the case was pending, Mr. Santaniello represented both defendants and never intimated that brother Alex had stolen his sister's car. The new tactic raised a number of questions: (1) If the car was taken without Flor's permission, why was the car never reported stolen? (2) Why would Flor's insurance carrier tender the policy limits? (3) Why wait from December 28, 2003 (the date of the accident) until November 27, 2006, to assert for the first time that Alex had stolen the car and separate counsel was necessary?
Even on the eve of trial, defense counsel was less than candid, telling the court that he "felt uncomfortable trying the case where she would have an indemnity claim back against [her brother] some day." Counsel then went on to explain: "This isn't a liability case. Assuming we will admit liability, we'll ask Counsel not to get into too many details on liability ... We fell asleep at the wheel, apparently."
At trial, the testimony of both Alex and Flor matched. They both claimed that Alex took the car without Flor's permission. In fact, Mr. Santaniello predicted it before jury selection: "There is an issue on consent. They both say he didn't have consent to take the vehicle ..." Ruimy's counsel attempted to counter with the obvious responsethat the entire defense had been contrived in an attempt to avoid paying whatever verdict the jury awarded. It is undisputed that brother Alex was uninsured, usually unemployed, and probably judgment-proof. Understandably, plaintiff's counsel sought to challenge the defendants' credibility and show the jury that their testimony was motivated by an attempt to avoid satisfying any potential judgment.
During trial, both Flor and Alex asserted that Alex took the car without Flor's consent while Flor was out of town on a business trip. Alex testified that he lived with his parents; that on previous occasions Flor had left the keys to her vehicle on a hook by the front doorway of their parents' home; and that he had previously driven her car. He admitted that when he had previously driven her car (just like this time), he had done so by taking the car keys off the hook. He acknowledged that the location of the keys was "readily available for anyone in your house to use to operate the car." He also admitted driving it without any family members in the car. Alex maintained that, until after this accident, he had never informed Flor that he had driven her car. He testified that Flor told him not to drive her car "anywhere up to 20 times" or "possibly 50 times." Alex volunteered that he was effectively judgment-proof:
Q: Did your sister ever tell you a[sic] she was that you might take her car?
A: That she was afraid I might take her car?
Q: Yeah.
A: No. I asked permission and she said no and she told me it was because if anything happened to her car I wasn't financially capable of reimbursing her in any way.
Moments later, he voluntarily brought up his own lack of insurance:
Q: Did [Flor] tell you you should be a more responsible driver?
A: I can't remember her saying those exact words but everyone in my family was pretty much, you know, giving me a hard time. I wouldn't say a hard time but yeah, words, working me over about how I should be more *1142 careful and more responsible in the future.
Q: Do you drive your father's car?
A: Now?
Q: Well, then.
A: Then, I don't believe so. Not until he put me on his insurance.
While maintaining that she did not consent to Alex's use of her car, Flor admitted that she did not recall what, if anything, she told her parents about the use of her car before she left on this business trip. She testified that she was concerned because Alex had been in multiple accidents using other people's vehicles. She admitted that before leaving on her trip and leaving her car keys on the hook at the front door, she did not tell Alex not to use her car, believing "it was just clear he was not supposed to" because she had told him that in the past. She further admitted that her prohibition was not absolute, but that Alex was authorized to use the car if an emergency arose. Their father confirmed this.
When asked about previous occasions on which Alex had used her car, Flor denied any specific knowledge, but she also said it was "plausible" that her parents allowed him to drive it. She also testified:
Q: I want to know why he took your car even though he should have assumed or known from the past that he should not have taken your car.
A: Have you ever dealt with a teenager?
Q: He's not a teenager now.
A: He's a 26-year-old teenager; okay?
Flor also admitted that, given Alex's immaturity, it was certainly possible that he would take the keys off the hook even if instructed not to do so:
Q: So you could not foresee your brother taking the keys from the hook that was available while you were on vacation?
A: I used to take my parents' keys off the hook, off the nightstand, out of the kitchen, you know, take my parents' cars when I was a kid, too, without them knowing. So there is a possibility, sure, there is a possibility in any household that somebody is going to take the keys and do something they are not supposed to do. I suspected that he would know.
Just as Alex had volunteered the fact that he was essentially without assets, Flor said the same thing about himagain without any prompting from Ruimy's counsel:
Q: Is it your testimony that you specifically prohibited your brother from using your car while you were on vacation, out of town, using a car that you were not using, using a car that was in your  that you placed in the driveway of your home?
A: Should he have had the permission to drive my car and had gotten in an accident and unfortunately did happen in this occasion when he didn't even have my permission, I was afraid it would cause a family crisis situation because he would not be able to cover the cost of fixing my car. We would then be in altercations.

II.
A trial court's decision to grant a new trial is reviewed for abuse of discretion. See, e.g., Leyva v. Samess, 732 So.2d 1118, 1121 (Fla. 4th DCA 1999). As the Florida Supreme Court stated in Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla. 1980), "[i]f reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable *1143 and there can be no finding of an abuse of discretion." Given that two of my colleagues find the trial court's decision as reasonable, I cannot in good conscience then conclude that the ruling was unreasonable.
I must iterate, however, that I cannot agree that the trial court should have granted a new trial. Its discretion was necessarily circumscribed by the applicable standard: A jury verdict should not be overturned unless the trial court is convinced that the comments were improper, inflammatory and "so egregious as to interfere with the essential justice of the result." Rohrback v. Dauer, 528 So.2d 1362, 1363 (Fla. 3d DCA 1988). Furthermore, "attorneys are allowed wide latitude in presenting an argument to a jury," Brumage v. Plummer, 502 So.2d 966, 968 (Fla. 3d DCA 1987), and "even improper argument will not require a new trial if the remarks are not so egregious as to interfere with the essential justice of the result." Rohrback, 528 So.2d at 1363. The improper comments must be "so inflammatory and prejudicial that they deny the opposing party a fair trial." Maksad v. Kaskel, 832 So.2d 788, 793 (Fla. 4th DCA 2002). See Bakery Associates., Ltd. v. Rigaud, 906 So.2d 366 (Fla. 3d DCA 2005).
Thus, while the trial court properly sustained a number of objections during the trial and plaintiff's closing argument, I do not believe the comments or questions were sufficiently egregious. During closing, Ruimy's counsel attempted to deal with the family's testimony. Like the testimony of any witness, he was entitled to challenge the credibility of the testimony of the Beal family. immediately asked the jury to consider the credibility of the witnesses. Standard Jury Instruction 2.2 on the believability of witnesses allows consideration of "any interest the witness may have in the outcome of the case." Counsel could legitimately highlight Flor's economic interest in blaming her brother, who was in effect judgment-proof. Counsel framed the issue of consent as whether Flor was not a careful person in making sure her car keys were not so openly displayed so that her brother could take the car. He stated:
So I plead with you to find responsibility for the owner of the car for facilitating, you know, her brother. Her brother did not have a car. She left her car there. Now, the keys were placed on the hook. All this business about, well, you know, I am not trying to escape liability, but I did not give him permission. I don't have a recorder or a fly on the wall to know what really happened with the family. But the only people who were financially responsible say it's all my brother's fault. You should only bring a judgment against him and, therefore, I did not give him permission.
There was no objection to this argument.
A few pages later, Ruimy's counsel stated:
So, therefore, on the jury form, I respectfully request that the first question about whether there was consent, either expressed or implied, you answer, yes, because of the way this family conducted themselves. They knew he didn't have a car. They knew his background. They knew that he didn't have a car on his own and she was away and those keys were provided right on the hook. Now, as I said before, can someone come in court and just say anything they want? No. The other side has no recorder, no way of knowing actually what took place around the table when they decided what they might say in court.
Defendants' objection to improper argument caused the court to have a sidebar, at which the following transpired:

*1144 THE COURT: Why is the argument improper?
MR. SANTINELLO: Because he is in a nice way saying that we are liars ...
The trial court sustained the objection but denied the mistrial. Defendants did not request a curative instruction.
Ruimy's counsel continued arguing that a judgment against Alex would only be a paper judgment:
You will recall that I read that part to you where she [Flor] says that, well, that time, I don't recall saying don't drive my car when she went to New York. Now, as I said I don't sit around  Laura [the Plaintiff] does not sit around the table and is not part of their family. That's their family. They don't talk and give anybody each other's car, whatever. But they do know where the financial responsibility lies. That is with 
At this point, the trial court overruled Mr. Santinello's objection, and the plaintiff's counsel continued his sentence: "Where the financial responsibility is. The responsible person, the person who can respond financially, is the car owner. So they want you to absolve the car owner, so that Laura [the Plaintiff] can never recover any money." Defense counsel objected as improper argument and the court had another sidebar, where Mr. Santinello explained: "He can't argue that they should find against my client because she will not recover against the driver." This actually misquotes plaintiff's argument. Nevertheless, the court sustained the objection and denied the motion for mistrial. Again, no curative instruction was requested.
Shortly after describing that Florida law "wants to make sure the innocent person in an accident is made whole," Ruimy's counsel added, "[s]o the law in Florida is that we care more for the victim and not the wrongdoer." The court sustained defendants' objection and instructed the jury to disregard the comment. Ruimy counsel then explained that "they have admitted that he [Alex] was wrong in striking her [the Plaintiff] down. That's what I mean by a wrongdoer."
During his own closing argument, Flor's counsel argued that his client left her car keys with her disabled mother and it was well known that no one drives your car. "It's a family policy, undisputed, and he wants to hang her for that." Counsel then recounted how Alex had admitted he had previously taken Flor's car: "Now, if they are all such liars and connivers, why would he admit that?"
On appeal, to justify the new trial, appellees argue that there were two constant themes that were highly improper and inflammatory during plaintiff's closing argument: 1) that a verdict against Alex Beal alone would be a "paper judgment" because he had no assets; and 2) that defendants and their father "conspired to lie in Court, and to defraud the Court and the jury, by coordinating their testimony in order to ensure that a judgment is entered only against Alex Beal  thus precluding Plaintiff from collecting on her judgment." I see nothing wrong with the first line of argumentplaintiff is entitled to challenge the credibility of witnesses and the standard jury instructions allow consideration of "any interest the witness may have in the outcome of the case." Flor had an economic interest in avoiding a money judgment entered against her while blaming her judgment-proof brother. As to the second argument, I agree that there was no evidence that the Beal family sat "around the table when they decided what they might say in court," but I cannot find this sufficient to warrant a new trial.