DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**R.J. REYNOLDS TOBACCO COMPANY** and **PHILIP MORRIS USA INC.,**
Appellants,

v.

**MYRON KAPLAN**, as Personal Representative of the
**ESTATE OF SHEILA KAPLAN,**
Appellee.

No. 4D18-2880

[June 23, 2021]

Appeal and cross appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carlos A. Rodriguez, Judge; L.T. Case No. 08-025823.

Scott A. Chesin and Michael Rayfield of Mayer Brown LLP, New York, N.Y., and Geoffrey J. Michael of Arnold & Porter Kaye Scholer LLP, Washington, D.C., for appellant Philip Morris USA Inc.

William L. Durham II and Val Leppert of King & Spalding LLP, Atlanta, GA, for appellant R.J. Reynolds Tobacco Co.

Bard D. Rockenbach of Burlington & Rockenbach, P.A., West Palm Beach, and Scott P. Schlesinger, Jonathan R. Gdanski and Brittany Chambers of Schlesinger Law Offices, P.A., Fort Lauderdale, and Philip J. Padovano and Celene H. Humphries of Brannock Humphries & Berman, Tampa, for appellee.

### *ON MOTION FOR REHEARING EN BANC AND REVISED WRITTEN OPINION*

CONNER, J.

We deny the appellants' motion for rehearing en banc, but grant appellants' motion for a revised written opinion, withdraw our opinion dated December 9, 2020, and issue the following in its place:

Appellants R.J. Reynolds Tobacco Company and Philip Morris USA, Inc. (collectively, "Tobacco") appeal a judgment in favor of Myron Kaplan

("Plaintiff"), as personal representative of the estate of Sheila Kaplan ("Decedent"). Tobacco raises five issues on appeal. We affirm as to all five issues without discussion, except for the issue concerning two egregiously improper closing arguments by Plaintiff's counsel.[1] We choose to discuss that issue because the problem is recurring, and the trial court improperly overruled objections to the arguments. We write to stress once again to trial judges the importance of curbing improper closing arguments designed to appeal to the emotions and passions of jurors. Inflammatory improper arguments must be stopped to maintain public confidence in our system of justice.

*Background*

Decedent began smoking cigarettes at age 14 or 15, including brands manufactured by Tobacco. Plaintiff and Decedent married in 1964. When Plaintiff first met Decedent, she was a "heavy smoker." Decedent was eventually diagnosed with a lung tumor in 1994, leading to surgery to remove one of her lungs. After the surgery, Decedent quit smoking. Although the doctors thought she was in remission, her cancer returned, and she eventually died.

Plaintiff filed a six-count complaint against Tobacco making the usual *Engle*[2] progeny case claims. As typical with *Engle* cases, the trial was conducted in two phases. Much of the evidence in Phase I revolved around the issue of whether Decedent died of a form of lung cancer established by the *Engle* findings to be caused by smoking.

During the initial closing argument in Phase I, immediately after making reference to the *Engle* findings, Plaintiff's counsel made the following argument, to which Tobacco objected:

| [Plaintiff Counsel]: | Now, the obligation would have been, upon the discovery in the '50s of this terrible truth about their product, would have been stop making it or fix it. And |
|---|---|

---

[1] We affirm as to Tobacco's claim that punitive damages are barred by section 768.73(2)(a), Florida Statutes, based on *R.J. Reynolds Tobacco Co. v. Konzelman*, 248 So. 3d 134, 135 (Fla. 4th DCA 2018). We further affirm as to Tobacco's claim that the preclusive use of the *Engle* findings violated due process based on *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419, 430-31 (Fla. 2013).

[2] *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246 (Fla. 2006).

2

they fooled the public health, right? Even they—even—

They even had that third-party strategy of corrupting scientists to do their bidding and to fool public health officials into saying, well, if you got to smoke, smoke the filters. And that went on for decades and decades. So that's another form of reassurance. The public health authority were unwitting dupes. They were helping.

So that's the *Engle* finding. That's the *Engle* trial. And these are your findings, right? These are—

There are blood, sweat and tears to get these things.

[Tobacco Counsel]: Objection, Your Honor; improper argument.

THE COURT: Overruled.

[Plaintiff Counsel]: It's like the movie "Schindler's List," right? There's a scene in "Schindler's List" where he holds up the list — it's the most powerful scene in the movie, as far as I'm concerned — he holds up the list and he shows the list of the names, the 800 names they're going to pull out of the concentration camp and save their lives —

[Tobacco Counsel]: Objection, Your Honor; improper argument.

THE COURT: Overruled.

[Plaintiff Counsel]: — and he says — he says —

He goes, the list is an absolute good. He says, the list is life. He says, all around

3

it is the void. All around it is the darkness.

This list of rulings [the *Engle* findings] for you is an absolute good. It's an absolute good.

Tobacco again objected and asked for a sidebar. At sidebar, the following exchange occurred:

[Tobacco Counsel]: He just analogized [Tobacco] to the Germans . . . to the Germans in the Holocaust. The victims of cigarette smoking and the victims of the Holocaust.

That is incredible. That is such a violation of proper argument. Characterizing [Tobacco] as Nazis, as being like those that killed — engaged in a genocide?

THE COURT: Well, I understand your objection, but I didn't get that out of it. He was talking about a movie and a list, and he mentioned the — . . . .

Plaintiff's counsel interjected that in *Engle*, the Third District reversed in part because Engle's counsel made a direct comparison of the tobacco companies to the Nazis; however, our supreme court reinstated the verdict after deciding the comparison was over the line, but not grounds for reversing a long trial. The trial court responded:

THE COURT: Right.

[Plaintiff Counsel]: Here, I'm not talking about —

I didn't compare them to Nazis. I'm not talking about —

THE COURT: You didn't go anywhere near that.

[Tobacco Counsel]: Holocaust is right in the middle of it. Sorry to interrupt.

4

THE COURT: No; I mean, he didn't go — he didn't go there . . . .

The trial court overruled the objection to the *Schindler's List* argument and asked if Tobacco was moving for mistrial. Tobacco moved for mistrial at sidebar and the trial court reserved ruling. After the Plaintiff's initial closing argument, Tobacco again moved for a mistrial based on the *Schindler's List* argument, as well as multiple sustained objections during the initial closing. The trial court again reserved ruling.

Later, Plaintiff's counsel ended his rebuttal closing argument in Phase I as follows:

[Plaintiff Counsel]: Let me finish with this. There is a passage from a book I want to read briefly. It is a book by George Orwell called *1984*.

It was made into a movie, okay. Jonathan Hurt, who is long gone and Richard Burton, who is long gone, academy award-winning actor, played the roles in the movie.

And the actor, Hurt, was the victim; and Big Brother was Richard Burton. And he —

[Tobacco Counsel]: Objection, Your Honor, improper argument.

THE COURT: Overruled.

[Plaintiff Counsel]: — he's standing over Winston, who he's about to torture, so he can make his mind right, so he can have nothing but the love of Big Brother.

He's standing over him, and this is what he says. And above all, Winston — no, sorry — and above all, we do not allow the dead to rise up against us. You must

5

> stop imagining that posterity will vindicate you, Winston.
>
> Posterity will never hear of you. You will be lifted clean out from the stream of history. We shall turn you into a gas and pour you into the stratosphere. Nothing will remain of you, not a name in a register.

[Tobacco Counsel]: Objection, Your Honor, this is improper argument.

THE COURT: Overruled.

[Plaintiff Counsel]: Not a memory in a living brain — not a name in a register, not a memory in a living brain. You will have been annihilated in the past, as well as in the future. You will never have existed.

When you go back there and you make this right and you do justice, you will prove that that passage will not come true for my client, [Decedent].

After Phase I of the trial, the jury returned a verdict for compensatory damages for past pain and suffering in the amount of $1.58 million, $520,000 for future damages, and $7,211 for funeral expenses. The jury also found by clear and convincing evidence that punitive damages were warranted against both tobacco companies, and, at the end of Phase II, the jury awarded Plaintiff punitive damages totaling $2,971,000.

After the verdict was entered, Tobacco moved for a new trial, raising multiple grounds. One such ground was multiple improper closing arguments, including the *Schindler's List* and the *1984* arguments. After denying the motion for new trial, the trial court entered a final judgment in conformity with the jury's verdicts. Tobacco gave joint notice of appeal.

*Appellate Analysis*

Although Tobacco's motion for new trial argued several instances of improper closing argument, Tobacco's appeal focuses on the *Schindler's List* and *1984* analogies and gives little attention to the other asserted

improper arguments. The initial brief devoted a total of three pages of analysis regarding the issue of improper closing arguments, discussing the issue with conclusory statements. Hence, we similarly confine our analysis to the *Schindler's List* and *1984* arguments.

### A. Plaintiff's closing argument "crossed the line."

"A trial court's denial of a motion for mistrial and a motion for new trial based on improper closing arguments are reviewed for abuse of discretion." *R.J. Reynolds Tobacco Co. v. Calloway*, 201 So. 3d 753, 759 (Fla. 4th DCA 2016) (quoting *Whitney v. Milien*, 125 So. 3d 817, 818 (Fla. 4th DCA 2013)).

Regarding closing arguments, our supreme court and we have stressed:

> The purpose of closing argument is to help the jury understand the issues in a case by "applying the evidence to the law applicable to the case." *Hill v. State*, 515 So. 2d 176, 178 (Fla. 1987). Attorneys should be afforded great latitude in presenting closing argument, but they must "confine their argument to the facts and evidence presented to the jury and all logical deductions from the facts and evidence." *Knoizen v. Bruegger*, 713 So. 2d 1071, 1072 (Fla. 5th DCA 1998); *see also Venning v. Roe*, 616 So. 2d 604 (Fla. 2d DCA 1993). Moreover, closing argument must not be used to "inflame the minds and passions of the jurors so that their verdict reflects an emotional response . . . rather than the logical analysis of the evidence in light of the applicable law." *Bertolotti v. State*, 476 So. 2d 130, 134 (Fla. 1985).

*Murphy v. Int'l Robotic Sys., Inc.*, 766 So. 2d 1010, 1028 (Fla. 2000) (alteration in original); *see also R.J. Reynolds Tobacco Co. v. Grossman*, 211 So. 3d 221, 226 (Fla. 4th DCA 2017); *Philip Morris USA, Inc. v. Tullo*, 121 So. 3d 595, 600 (Fla. 4th DCA 2013). We have repeatedly "caution[ed] counsel to be vigilant in crafting closing arguments that fall within the confines of permissibility." *Tullo*, 121 So. 3d at 602; *see also Sanchez v. Martin*, 248 So. 3d 1174, 1178 (Fla. 4th DCA 2018); *Cohen v. Philip Morris USA, Inc.*, 203 So. 3d 942, 947 (Fla. 4th DCA 2016); *Calloway*, 201 So. 3d at 765.

"A party may not give a closing argument . . . that is 'designed to inflame the emotions of the jury rather than prompt a logical analysis of the evidence in light of the applicable law.'" *Calloway*, 201 So. 3d at 760-61 (quoting *Intramed, Inc. v. Guider*, 93 So. 3d 503, 507 (Fla. 4th DCA 2012)); *see also Norman v. Gloria Farms, Inc.*, 668 So. 2d 1016, 1020–21 (Fla. 4th

DCA 1996) (explaining that it is impermissible to "appeal to the passions and prejudices" of the jury in closing arguments). Closing arguments designed to appeal solely to passion and sympathy are improper. *See Homeowners Choice Prop. & Cas. Ins. v. Kuwas*, 251 So. 3d 181, 186 (Fla. 4th DCA 2018).

Regarding improper closing arguments properly preserved for appellate review, "the trial court should grant a new trial if the argument was 'so highly prejudicial and inflammatory that it denied the opposing party its right to a fair trial.'" *Allstate Ins. Co. v. Marotta*, 125 So. 3d 956, 960 (Fla. 4th DCA 2013) (quoting *Engle*, 945 So. 2d at 1271).

Turning to the *Schindler's List* argument, Tobacco argued below that the Plaintiff was essentially likening tobacco companies to Nazis. The trial court agreed that such a comparison "would be extremely prejudicial and outside the scope of evidence," but did not think the reference to the movie created an inference that Tobacco was like the Nazis. With all due respect to the trial court, the import of comparing the *Engle* findings to the "absolute good" of Schindler's List, listing 800 names which were going to be "pull[ed] out of the concentration camp and save their lives" is a clear analogy comparing Tobacco to the Nazis. Even a person serving on a jury who had not seen *Schindler's List* would make that connection, even though Plaintiff's counsel did not specifically mention Germany, World War II, or the Nazis. More importantly, while the trial court may not have thought that the reference to the movie likened Tobacco to the Nazis, "[w]hat the jury hears or may understand or infer is the critical point." *Harris v. State*, 381 So. 2d 260, 261 (Fla. 5th DCA 1980).

Plaintiff's counsel argued that he did not directly compare Tobacco to the Nazis. Although he did not use the term "Nazis," saving people from concentration camps certainly implies saving them from the Nazis. What is particularly noteworthy is that before both the trial court and this Court, Plaintiff has proffered no logical explanation of how a list of names relates to a list of findings in a court proceeding. Our conclusion that Plaintiff's counsel was attempting to get by with an oblique, but obvious, comparison of Tobacco to the Nazis is amplified by the fact that the proffered explanation to the trial court suggested that the supreme court opinion in *Engle* focused on a reference to Nazis in closing arguments in that case, when in fact there is little discussion in *Engle* about improper arguments referencing Nazis; instead, the supreme court's primary emphasis was on the improper arguments regarding race. We conclude from the proffered explanation that Plaintiff's counsel took a calculated risk that he could make such a circuitous comparison to Tobacco acting like Nazis and get away with it.

8

Regarding the *1984* rebuttal argument, what is most striking is its focus on describing the context of the scene to give added emphasis to the words quoted to the victim. More specifically, counsel described that Winston was about to be tortured and his mind reprogrammed. Not only was the argument an appeal to sympathy by focusing on the torture Winston was about to endure, it was a direct appeal to the jurors' emotions, given the graphic context of the situation in which the words were spoken. It is also extremely significant that the description of the scene was *a second attempt to obliquely compare Tobacco to a torturous authoritarian regime.* Even more, Plaintiff was unable to logically explain during oral argument how the following final exhortation to the jury was not a direct appeal to render a verdict based on emotion:

> When you go back there and you make this right and you do justice, you will prove that that passage will not come true for my client, [Decedent].

We agree with Tobacco's argument that the *Schindler's List* and *1984* arguments were solely designed to inflame the passions of the jury and were improper. Counsel's argument that because no court has directly said that the *Schindler's List* analogy is improper is unavailing. To so hold would invite this and other courts to play "whack-a-mole"[3] by batting down every new and creative Nazi (or Big Brother) reference that can be devised.

It is disturbing that on at least *four* prior occasions, this court has addressed improper inflammatory closing arguments appealing to passion by trial counsel Scott P. Schlesinger or his firm Schlesinger Law Offices, P.A. *See Oshinsky-Blacker v. Philip Morris USA, Inc.*, L.T. Case No. CACE08-025841 (Fla. 17th Cir. Ct. Mar. 6, 2017), *aff'd*, 249 So. 3d 643 (Fla. 4th DCA 2018) (per curiam, affirming new trial); *Cohen*, 203 So. 3d at 948 (affirming the trial court's granting a new trial because "counsel made arguments which crossed the line into 'take responsibility' and 'apologize' territory," characterizing counsel's arguments as "improper" and "egregious and unacceptable"); *Calloway*, 201 So. 3d at 761 ("These comments were designed for no other purpose than to inappropriately evoke sympathy from the jury."); *Tullo*, 121 So. 3d at 601 (determining that the argument implying tobacco companies were as culpable as drug

---

[3] "Whack-a-mole" is an arcade game "in which players use a mallet to hit toy moles, which appear at random, back into their holes." See Whack-a-mole, LEXICO, https: /lexico.com/en/definition/whack-a-mole (last visited May 2, 2021).

dealers was improper). Three of these cases resulted in a new trial, and the fourth, *Tullo*, very well may have but for the defense's failure "to raise a contemporaneous objection to any of the challenged comments." *Id.* As our supreme court stated in *Engle* with respect to inflammatory closing arguments in that case, we similarly "condemn these tactics of" Mr. Schlesinger and conclude that his "conduct [was] unbecoming an attorney practicing in our state courts." *Engle*, 945 So. 2d at 1273.

### B. The unacceptable references during closing argument, standing alone, do not necessitate reversal in this case.

Although these two references during closing argument were inappropriate and Tobacco's objections clearly should have been sustained, these isolated errors do not rise to the level of requiring reversal. As noted above, with improper closing arguments properly preserved for appellate review, "the trial court should grant a new trial if the argument was 'so highly prejudicial and inflammatory that it denied the opposing party its right to a fair trial.'" *Marotta*, 125 So. 3d at 960 (quoting *Engle*, 945 So. 2d at 1271). For a few reasons, we determine that the improper arguments do not meet this standard.

Although the comments were discussed at length at sidebar and out of the jury's presence, the comments were brief and isolated in reference to what was said to the jury. *Cf. Whitney*, 125 So. 3d at 819 (Fla. 4th DCA 2013) (determining that the trial court did not abuse its discretion in denying the appellant's motion for new trial, because it could not be said that no reasonable man would take the view that the improper comments did not "undermine the entire three-week trial" (quoting *Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980))); *Maksad v. Kaskel*, 832 So. 2d 788, 793 (Fla. 4th DCA 2002) ("We have carefully read the entire closing argument. While a few words and phrases in Dr. Colletta's two hour closing argument and one word of the hospital's closing argument may be objectionable, in the trial court's view they did not justify a new trial. We agree."). Furthermore, the references to *Schindler's List* and *1984* were not repeated either directly or indirectly and, although deliberately inflammatory, were presented in a somewhat incoherent fashion (as was, frankly, much of Plaintiff's closing argument).

Finally, the verdict returned by the jury in each phase was far less than requested by Plaintiff's counsel. Although not determinative of whether prejudice occurred, it is a factor we can consider in making that calculation. *See R.J. Reynolds Tobacco Co. v. Schleider*, 273 So. 3d 63, 70-71 (Fla. 3d DCA 2018) (awarding compensatory damages in an amount less than requested was among the factors that "strongly indicate[d] the

jury was not inflamed, prejudiced, or improperly mislead by closing arguments.").

We point out what the supreme court said in *Murphy*: "[T]his decision does not impact the legal standards applicable to consideration of the issue that has been properly preserved by objection and motion for mistrial, which remains whether the comment was highly prejudicial and inflammatory." 766 So. 2d at 1012 n.2. The harm of inflammatory comments is that they do not "prompt a 'logical analysis of the evidence in light of the applicable law.'" *Marotta*, 125 So. 3d at 960 (quoting *Intramed*, 93 So. 3d at 507). Our extensive review of the record in this case leads us to the conclusion that the jury was not affected by the argument, understood the instruction that what the attorneys argued was not evidence, and rendered its decisions according to the evidence.

In its motion for rehearing, Tobacco argues that our original opinion was erroneous because it failed to apply the proper standard for harmless error, as set forth by our supreme court in *Special v. West Boca Medical Center*, 160 So. 3d 1251 (Fla. 2014). Tobacco is correct that the proper standard under *Special* is that "the appellate court must remain focused on the error itself in order to evaluate whether the beneficiary of the error has [shown] that there is no *reasonable* possibility that the error contributed to the verdict." *Special*, 160 So. 3d at 1256 (emphasis added).

However, Tobacco misunderstands our conclusion in this case. We have not failed to apply the proper harmless error standard; we simply have not found reversible error in the trial court's order denying Tobacco's motion for new trial. Logically then, because we determine no error, there is no need to conduct a harmless error analysis. *See Bruno v. Moore*, 838 So. 2d 485, 489 (Fla. 2002) ("If no error occurred, it follows that there was no need for a harmless error analysis."); *Curtis v. State*, 204 So. 3d 463, 466 n.2 (Fla. 4th DCA 2016) ("[T]here was no error in admitting the testimony about the bartender's identification of Curtis from a photo lineup, and no need for a harmless error analysis.").

*C. Trial Courts must be more vigilant in monitoring over-the-line closing arguments.*

The primary purpose of this opinion is **to repeat with emphasis to trial judges** what we said in 1994:

> **The fact that appellate courts proscribe misconduct by trial counsel, unfortunately, does not seem to eliminate it. It is therefore of vital importance that trial judges,**

11

**when objections are raised to improper argument as they were in this case, properly exercise their duties by stepping in and curbing it.**

*Bellsouth Hum. Res. Admin., Inc. v. Colatarci*, 641 So. 2d 427, 430 (Fla. 4th DCA 1994) (emphasis added).

Improper closing argument continues to be a major problem that undermines public confidence in our system of justice. For that reason, we ardently reemphasize a point we made in *Calloway*: **it is "the ultimate responsibility [of trial judges] to ensure proper behavior of trial counsel and fair trial proceedings in his or her courtroom" and it is their duty to curb improper argument to "ensur[e] that the jury [is] not being led astray."** *Id.* at 763 (emphasis added). This is especially important "in lengthy, high-stakes cases where a trial court's failure to control the litigants not only deprives the parties of a fair trial, but can ultimately result in scarce judicial resources being consumed when the case is remanded for re-trial based on those actions." *Id.* **"A trial judge should respond to such improper argument in a timely and consistent manner, and issue proportional rebukes when repeated instances occur."** *Id.* (emphasis added). When improper opening statements or closing arguments are repeated, the rebukes should be in front of the jury.

If the improper behavior continues, we remind trial judges of the option to use indirect civil contempt monetary sanctions for repeated violations of court rulings. *See, e.g., Moakley v. Smallwood*, 826 So. 2d 221, 226 (Fla. 2002) (holding that a trial court possesses the inherent authority to impose attorney's fees against an attorney for bad faith conduct).

*Affirmed.*

FORST, J., concurs.
KLINGENSMITH, J., concurs with opinion.

KLINGENSMITH, J., concurring.

I reluctantly concur in the majority opinion but write to address a shortcoming in our jurisprudence, as highlighted by this case. During oral argument, appellee's counsel implored this court not to punish their client for trial counsel's improper argument by reversing the jury's verdict. In follow up, we asked counsel how we should deal with issues of repeated attorney misconduct *other than* by reversing cases where the boundaries of permissible argument set forth by this and other courts have been

12

flouted. The response we received was essentially, "I don't know." Succinctly put, neither do we.

We have previously said that appellate courts should not reverse cases solely because of attorney misconduct where both sides engage in unprofessional behavior. *See Lemoine v. Cooney*, 514 So. 2d 391, 393 (Fla. 4th DCA 1987) ("Where each party's attorney engages in vituperation, it would be unfair to the litigant who won in the trial court to lose on appeal merely because his lawyer likewise participated in less than gentlemanly conduct."). It is the trial court's responsibility to both monitor and deter improper conduct, and the trial court must fulfill this responsibility when the conduct occurs. *See Bellsouth Human Res. Admin., Inc. v. Colatarci*, 641 So. 2d 427, 430 (Fla. 4th DCA 1994) ("It is the trial court's responsibility, when objections are made to improper argument, to sustain the objections and let counsel know that these tactics will not be tolerated."). Because we are constrained by stare decisis, we are often limited to merely chastising offenders when the misconduct did not result in an unfair trial. *See Jeep Corp. v. Walker*, 528 So. 2d 1203, 1204 (Fla. 4th DCA 1988) ("[I]t is not for us to substitute our judgment for that of the trial judge . . . unless we are convinced that a fair trial did not result."). If trial judges fail to vigilantly enforce standards of professional conduct, and if appellate courts are constrained in how we can thereafter respond, the result is untenable. Trials will simply become nothing more than games of chance where the goal is to get a favorable outcome at any cost, then roll the dice betting the appeals court will affirm. This court has discussed the problem since the late 1970s. *See Lemoine*, 514 So. 2d at 393; *Nelson v. Reliance Ins. Co.*, 368 So. 2d 361, 361 (Fla. 4th DCA 1978) ("We are distressed at an increasing tendency, by the trial bar, to permit the noble art of trial practice to degenerate into a free-for-all."); *Jeep Corp.*, 528 So. 2d at 1204. The fact that we are still discussing it as an ongoing issue, after over forty years, is remarkable.

Clearly, whatever we have previously written on this subject has failed to take hold. For that reason, I believe the time has come to take a different course in the future—one that includes our court taking a more active role in how we deal with the misconduct of trial attorneys. This might include reconsidering our prior holdings that advised against reversing cases based on attorney misconduct, especially in cases such as this where the improper conduct was unilateral. *Cf. Lemoine*, 514 So. 2d at 393. Today we hold that the results obtained by appellee at trial did not indicate the offensive comments had any effect on the jury. But if *Special v. West Boca Medical Center*, 160 So. 3d 1251 (Fla. 2014), stands for anything, it is the notion that the burden lies with the appellee, who potentially benefitted from the grossly improper arguments, to prove that the comments had no

effect on the jury. *Id.* at 1256. That is a difficult standard to apply, especially in cases where the benefit to the appellee cannot be precisely measured by the amount of compensatory or punitive damages awarded. In some cases, the benefit might simply be the jury's decision to award punitive damages in the first place—at *any* amount. But that is an issue we leave for another day.

In my opinion, arguments like the veiled reference made here comparing appellants to Nazis are so outrageous that, going forward, we should hold that they constitute grounds for reversal in all but a very few circumstances because "neither rebuke nor retraction may entirely destroy their sinister influence." *Norman v. Gloria Farms, Inc.*, 668 So. 2d 1016, 1023 (Fla. 4th DCA 1996) (quoting *Baggett v. Davis*, 169 So. 372, 379 (1936)); *see also Murphy v. Int'l Robotic Sys., Inc.*, 766 So. 2d 1010, 1027 (Fla. 2000) (stating that a litigant must either object at trial or make a motion for new trial to preserve an argument that opposing counsel's comments amount to fundamental error). I have no doubt this court would so hold and properly reverse had counsel's argument instead used an analogy comparing the appellants and their actions to the Ku Klux Klan, lynching, or anything else designed solely to evoke the strongest negative visceral reaction from the jury.

It is unfortunate that innocent litigants may ultimately suffer a reversal of their cases through no direct fault of their own, but this should not serve as an impediment to our action. Litigants suffer when appellate courts reverse cases for a variety of reasons, including improper argument. They also suffer when appellate courts affirm outright dismissals of cases caused by clear attorney malpractice. *See Spaziano v. Price*, 763 So. 2d 1047, 1048 (Fla. 4th DCA 1999) (discussing the Third District's affirmance of a case in which a law firm failed to file a cause of action before the statute of limitations, thus causing the firm to be sued for legal malpractice). Although a reversal deprives the litigant of the result achieved at trial, the effect of that reversal is far less draconian than a dismissal because it leads to a new trial—one where the desired results can be achieved under much fairer circumstances. By declining to reverse cases solely because of attorney misconduct, attorneys who flagrantly ignore the rules are permitted to benefit from their malfeasance. When there is no real sanction for such behavior and thus no effective deterrence, something must change. But make no mistake; the primary responsibility for curbing misconduct lies first and foremost with the trial judge. If trial judges took greater care to ensure that such actions are not tolerated, there would be no need for our court to be involved.

There is an old saying that "there is no education in the second kick of a mule."  Our opinion in this case provides the fifth—and hopefully *final*—kick needed to emphatically deliver the majority's message to this trial counsel specifically, and to trial judges more generally.  We have made our expectations clear, and our tolerance should not be expected in the future.

*       *       *

***Not final until disposition of timely filed motion for rehearing.***

15